[Sac. No. 4147. In Bank.—March 28, 1930.]

SENECA CONSOLIDATED GOLD MINES COMPANY (a Corporation), Respondent, v. GREAT WESTERN POWER COMPANY OF CALIFORNIA (a Corporation), Appellant.

Guy C. Earl, W. H. Spaulding and Warren Olney, Jr., for Appellant.

L. H. Hughes, H. B. Wolfe and Brobeck, Phleger & Harrison for Respondent.

Wm. B. Bosley and Robert H. Gerdes, *Amici Curiae.*

PRESTON, J.—This appeal involves a conflict of claims to the right of use of the waters of the North Fork of the Feather River at certain points thereon in Plumas County. The record is large and the briefs of counsel are numerous and voluminous, but we intend to confine this discussion within comparatively narrow limits.

Plaintiff, a corporation, the owner of certain lode mining claims, on the ninth day of August, 1924, sued defendant public utility corporation to enjoin it from diverting the natural and normal flow of the waters of said stream above ·plaintiff's lands. The complaint is in two counts. The first is predicated upon its prescriptive right in said stream and the second upon its riparian right therein. Defendant answered framing its pleadings to call into operation the provisions of section 534 of the Code of Civil Procedure and the chapter on Eminent Domain, first making categorical denial of some of the allegations of the complaint, admitting directly and by implication other allegations, but resting its defense in the main upon a claim of prescriptive rights in said waters, estoppel and the statute of limitations. At the same time it also filed its cross-complaint, pleading in effect that if any rights to the use of said stream by plaintiff, other than its prescriptive right to 2,500 miner's inches of water, be found to exist, that it be allowed a judgment condemning such rights pursuant to the law of Eminent Domain.

The cause was tried beginning on the fourth day of May, 1927. The trial was in two parts. The equitable issues were heard by the court and the issue as to damages by the

court sitting with a jury. The court first announced its conclusion respecting the rights of the parties, finding the extent and measure of plaintiff's prescriptive right and further finding in plaintiff a riparian right in the remainder of the normal flow of said stream in addition; then it defined concretely both of these rights; submitted to the jury the issue of damages; received its verdict; made formal findings embracing the verdict and all the other facts, and thereafter entered its judgment declaring the rights of plaintiff and decreed an injunction as prayed unless the amount of the verdict, $350,000, was deposited in court or a bond given in lieu thereof within the time provided by law. Defendant has appealed on a full record.

The above outline will aid us in our consideration of the material facts, which we shall now set forth. The North Fork of the Feather River is a natural watercourse, with well-defined bed and banks, having its source in the Sierra Nevada mountains, and being fed and supplied for its normal and natural flow from creeks and springs, and in particular from a large spring situate in Big Meadows, Plumas County. Plaintiff, at the commencement of the action, was the owner of some five different lode mining claims, the first of which was known as the White Lily, located on April 4, 1896. All are traversed by said stream. From that date plaintiff's predecessors in interest began to divert and plaintiff and/or said predecessors have since continuously diverted the waters of said stream by dam, ditch, flume and pipe-line to the said claim and have used them for operating a quartz stamp-mill thereon, and also for mining, milling, irrigation and domestic purposes, as well as for the generating of electric power for said mine. The amount of this diversion is one of the questions in dispute. Defendant conceded it to be to the extent of 2,500 miner's inches. The court, however, found it to be 4,240 miner's inches or 106 second-feet.

The court found also that prior to the inception of any rights on the part of defendant in said stream, plaintiff located and made discovery upon a second mining claim, known as the Addie Bell Lode Claim, and that it, too, was entitled to riparian rights in said stream superior to the appropriative claims of defendant. Defendant disputes the

finding that discovery of said Addie Bell Claim was made prior to the inception of its rights.

As to the three remaining claims of plaintiff, the court found that said upper appropriation made by defendant was superior to the riparian rights otherwise adhering therein.

In 1902 the predecessors in interest of defendant posted notices of appropriation of the waters of said stream at the intended points of diversion, being points on said river above the property of plaintiff. These notices were regular in form, properly posted and work thereunder was pursued in the manner provided by law for the perfecting of appropriative rights. In the year 1913 the predecessors of defendant, as a part of this development, constructed a dam across said stream about six miles above the mining claims of plaintiff, thereby restraining the natural flow as well as the flood waters of said stream, flooding the said Big Meadows and creating a large artificial reservoir commonly known as Lake Almanor. The object of this development was the storing of the normal and flood waters of said stream for the purpose of generating by its use electric energy for sale to the public.

At about the same time defendant, or its predecessors, also completed the first unit of its plan by constructing a power-house on the said stream at a point known as Big Bend, some thirty miles below said mining claims of plaintiff. Said power-house was built to use the flow of said river at said point in the generation of electric current. From the year 1913 to the year 1921 there was no other outlet for said dam except down the said Feather River. Defendant used said dam for the purpose of storing in said reservoir such waters as it required for the operation of its said power-house, and later discharged down said river such waters from said reservoir at such times and in such amounts as were necessary for the convenient and successful operation of its said power plant, bearing in mind always and respecting the prescriptive rights of plaintiff. In the year 1921 defendant completed the construction of diversion works to take from said Lake Almanor into a reservoir in Butt Valley and thence to another power plant constructed by it and called the Caribou plant, situated also on said stream below the claims of plaintiff, and above the plant at Big Bend, a portion of the waters of said stream, and from

the year 1921 to the commencement of this action defendant has diverted from said lake and passed around the claims of plaintiff, and discharged into said stream below said claims a part of said water so stored in said reservoir and has used the water so diverted for the generation of electric energy at said last-mentioned power-house. At the time of the commencement of this action defendant was engaged in constructing a cut in the bottom of said Lake Almanor, leading to the entrance to said tunnel from said lake into Butt Valley, through which it could take more of the waters of said reservoir than it had theretofore diverted, and the court found it to be and admittedly it is the intention of defendant, when authorized by law so to do, to divert around plaintiff's land all of the waters of said stream in excess of the prescriptive right to which plaintiff is finally found to be entitled.

■ Many contentions are made by defendant for a reversal of the judgment, a number of which will be referred to in passing, but, to our mind, the underlying proposition which determines the course of this appeal is whether or not defendant has, by its acts and conduct, gained a prescriptive right over plaintiff in and to the use of any of the usual or normal flow of said stream. As above intimated, the court accorded to defendant no preferential right therein and, moreover, declined to allow the jury to give consideration to any such claim by defendant. If any such right existed, then defendant was entitled to have it weighed in assessing the amount of damage done plaintiff's lands by the proposed diversion of the stream. If a material element tending to reduce the damages suffered by plaintiff was denied consideration, then, of course, the error was prejudicial. In order to realize the importance of this issue, it is necessary to state further findings of the court.

The court found, as already noted, that plaintiff's prescriptive right in said stream for the use of said mining claims was 4,240 miner's inches or 106 second-feet of water; also, "That the White Lily Quartz Claim and the Addie Bell Quartz Claims are riparian to the North Fork of the Feather River and that the riparian rights attached thereto are superior to any right of defendant in and to any of the normal flow of the waters of the North Fork of the Feather River." "That it is not true that since the year 1913, or

at any other time, or at all, that defendant has openly and notoriously, or openly, or notoriously, under claim of right or otherwise, increased and diminished the volume of water in said river at will, but on the contrary the Court finds that prior to August, 1921, that the water passing through the lands of plaintiff 'has at all times been equal to or in excess of 581.05 second feet of water." The court also found that "plaintiff is entitled to have the waters of the North Fork of Feather River flow in their original and natural channel and without obstruction, interruption or diminution, and without diversion thereof, not exceeding 581.05 second feet. . . ." The court also made the finding that "plaintiff is entitled to have by reason of use and under the stipulations between the parties 4240 miner's inches flow down at all times, in the natural channel of the North Fork of Feather River without restriction or interruption, and that in addition thereto plaintiff is entitled to have flow down without interruption by defendant, 475 second feet of the waters of the North Fork of Feather River as the riparian owner of the White Lily and Addie Bell Quartz Mining Claims."

In its charge to the jury, while deliberating upon the issue of damages, the court instructed it as follows: "The Court has also found that plaintiff, Seneca Consolidated Gold Mines Company, is entitled, by reason of such riparian ownership, to have flow through said mining claims throughout the year an amount of water equal to the ordinary usual and normal flow of said river for the months of July, August and September as shown by the evidence, the mean of which has been testified to be 581.05 second feet or 23,242 miner's inches of water measured under a four-inch pressure."

It will thus be seen that in effect the jury were told that plaintiff had a right to a specific concrete amount of water and was entitled to have the same at all times flow by its lands. In other words, the riparian right of plaintiff was defined to be a constant specific right to so many second-feet of water measure, not at defendant's dam, but at its own property. The implication from the findings above quoted is that defendant has no prescriptive right whatever in the normal waters of the stream, but, on the contrary, held and enjoyed only the right to divert and store what is known as

extraordinary flood waters, in which no riparian right usually inheres. In other words, the court's findings preclude any claim on the part of defendant to a prescriptive right to store, impound or manipulate to any extent the normal flow of the said stream.

The question then is: Does the evidence support such an implied finding? Admittedly for more than nine years defendant operated said reservoir. Admittedly its action was open and notorious and it paid all taxes assessed against it. By a stipulation of the parties it was conceded that its storage was not confined to the flood or freshet waters but extended also to the "natural flow" of said stream. By the same stipulation it was admitted that said dam was used "for the purpose of storing in the reservoir created thereby such water of the north fork of the Feather River as was not at the time required for the operation of the defendant's said power-house at Big Bend and later discharging down such river such water from said reservoir at such times and in such amounts as was necessary for the operation of said Big Bend power plant."

It was alleged in plaintiff's complaint and by implication admitted by failure of defendant's answer to deny, as follows: "That defendant, by means of said dam, so constructed as aforesaid, prevents the normal and natural flow of said North Fork of Feather River from flowing in its natural channel down, through, over and across the lands of plaintiff; that said defendant by the manipulation of a gate in said dam is able to increase and diminish the volume of water, flowing in said North Fork of Feather River below its said dam, at will, and that said defendant so does, thereby rendering it unsafe for plaintiff, its agents, servants and employees to be on or along said stream on the property of plaintiff and thereby making it impossible for plaintiff to regulate, in any manner, its diversion of the waters thereof or to maintain its diversion works and equipment to plaintiff's great and irreparable damage and for which plaintiff has no plain, speedy, or adequate remedy at law." There is therefore, under the undisputed admission of the parties, a complete refutation of the claim that defendant has stored for all these years only storm waters of said stream.

Furthermore, the only other reliable evidence introduced on the subject was the records of defendant's company as to the discharges from said reservoir during the period intervening between 1916 and 1924, inclusive, from which it is clear that for months at a time few or no discharges were permitted from said reservoir. This fact is conceded by respondent. In other words, during the periods of high water, the stream would be largely fed by tributaries below defendant's dam and the necessity for water from the reservoir would be slight and during said periods, defendant would store practically all the waters of said stream reaching its dam and thus build up a supply for use during the seasons of low water.

But respondent contends that the uniformity of flow at its lands during the period of heavy run-off was maintained by the influx of water above its lands and below defendant's dam. It must be here specially noted that these waters are not to be diverted by defendant and respondent is not entitled to consider them in ascertaining the existence of a prescriptive right in defendant nor as an element of injury on the taking sought. Furthermore, that the use by defendant was by the court thought to be adverse seems to follow from its finding that as to the three other mining claims of plaintiff, defendant owned an appropriative right in the entire stream in excess of the prescriptive right of plaintiff, for the court in that connection charged the jury as follows: "You are instructed that as to all the lands of the Seneca Company except the White Lily and Addie Bell Claims, the power company has, by reason of the priority of its appropriations, the superior right to the water of the river in excess of 106 second feet and that you are not in any way, directly or indirectly, to take into consideration the value, if any, which the waters of the river may have for use upon any lands, either of the Seneca Company or anyone else, other than the two claims mentioned, the White Lily and the Addie Bell."

Respondent, however, meets this contention by the assertion that defendant during all this storage was itself a riparian owner and that the storage carried on was in the exercise of its riparian right and not adverse to its riparian right. (Citing *Pabst* v. *Finmand*, 190 Cal. 124 [211 Pac. 11].) This contention it supports by the further statement

that up to the inception of this proceeding it had enjoyed the use of all the water of the stream it needed.

In view of the above-noted contention, a general definition of the right of storage in a riparian proprietor seems to be required of the court. The question in another form is: May a riparian owner, when the stream carries more water than is necessary for the propulsion of his mill or power plant, store such surplus water until he shall be able to use it in a contemplated dry season to follow?

The riparian doctrine comes down to us from the common law and it has been repeatedly defined in this state; hence little time need be spent in recounting the holdings of the courts in this regard. A few citations will suffice.

" . . . Every owner of land, through which a natural stream flows, has a usufruct in the water of the stream as it passes along, and has an equal right with those above and below him to the natural flow of the water in its accustomed channel, at its usual level, without unreasonable detention or substantial diminution in quantity or quality, and that none of the owners can make any use of it prejudicial to the rights of the other owners, unless he has acquired a right to do so by license, grant, or prescription." (1 Kinney on Irrigation and Water Rights, 2d ed., p. 939, sec. 543. Citing *Paige* v. *Rocky Ford Canal etc. Co.*, 83 Cal. 84 [21 Pac. 1102, 23 Pac. 875]; *Chauvet* v. *Hill*, 93 Cal. 407 [28 Pac. 1066], and other decisions. See, also, *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607], and vol. 25 Cal. Jur., p. 1060 et seq., where the cases are collated.)

The use of the hydraulic effect of the stream for the generation of electric current is, of course, a legitimate exercise of the riparian right. (*Mentone etc.* v. *Redlands*, 155 Cal. 323 [17 Ann. Cas. 1222, 22 L. R. A. (N. S.) 382, 100 Pac. 1082]; *Herminghaus* v. *Southern California Edison Co.*, *supra*.)

But to what extent may such owner detain, store or impound the waters before the right ceases to be a riparian one and becomes an adverse or appropriative right which may ripen into a prescriptive one, is the question? Little has been said on this point by the courts in recent years. In the days of the old mills, when the momentum of the stream upon the overshot wheel, furnished the power, this

question was present, and received thoughtful consideration by the courts, particularly in New York, Massachusetts and Texas. The logic of the positions then taken seems to be entirely sound and to be controlling here.

In *Rhodes* v. *Whitehead*, 27 Tex. 304 [84 Am. Dec. 631, 634], it is said: "And the momentum of the stream may be resorted to as a power for making it available, or it may be turned by a proprietor on his own land by a dam, or by any other means which he may find appropriate for the purpose. Yet, unless he has acquired the right of doing so by grant, license, or such adverse possession as will give him the right by prescription, he cannot do it in a manner that will unreasonably detain the water, not consumed, from the riparian owners below, or throw it back beyond the line where it passes from the land of the owner above him. For every party must exercise his own rights, and use his own property in such a manner as shall not cause detriment to that of another."

In 40 Cyc., page 606, we find the matter summed up as follows: "A riparian owner has a right to erect a dam across the stream on his land, and to detain the water for such reasonable time as may be necessary to raise the requisite head, and accumulate such a quantity as will enable him to use the water for the purpose of his machinery; but he cannot, as against a lower riparian owner, by means of a storage dam erected on his own land, detain such surplus water of the stream as he may not require for his present use until it may be wanted by him in a dry season. . . . "

Probably the best considered case on the subject to be found anywhere is the case of *Clinton* v. *Myers*, 46 N. Y. 511 [7 Am. Rep. 373]. Quoting from the syllabus, paragraphs one and two, it is said: "No riparian proprietor has a right to use the water of a stream to the prejudice of other proprietors above or below, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He may use the water while it flows over his land as an incident thereto, but he cannot unreasonably detain it, or give it another direction, but must return it to its ordinary channel when it leaves his estate. A party has a right to erect a dam across a stream upon his land, and such machinery as the stream in its ordinary stages is adequate to propel, and if, in seasons of drought, it becomes inadequate for that purpose, he may

detain the waters for such a reasonable time, as may be necessary to raise the requisite head to enable him to use it advantageously and profitably upon such machinery. He has no right to erect machinery, requiring for its propulsion more water than the stream furnishes at its ordinary stages, and operate such machinery by accumulating the water and discharging it upon those below in unusual quantities to their prejudice. Nor has he a right to create a reservoir, and detain and store the water therein for future use in a dry season." This doctrine has been reaffirmed in New York in several recent cases. (See *Fulton County etc. Co.* v. *Rockwood Mfg. Co.*, 205 App. Div. 787 [200 N. Y. Supp. 225], *United Paper Board Co.* v. *Iroquois P. & Paper Co.*, 226 N. Y. 38 [123 N. E. 200], *Little Falls Fibre Co.* v. *Ford & Son, Inc.*, 249 N. Y. 495 [164 N. E. 558], *Henry Ford & Son* v. *Little Falls Fibre Co.*, 280 U. S. 369 [74 L. Ed. 140 (Adv. pt.), 50 Sup. Ct. Rep. 140], decided Jan. 6, 1930, which is indirectly in point.)

See, also, as directly in point, *Still* v. *Palouse Irr. & Power Co.*, 64 Wash. 606 [117 Pac. 466, 467], which concerns a stream in Washington much like in its habits the stream under consideration here. Defendants were enjoined by a lower riparian proprietor from storing the water of the natural flow for future use, and the court there said: "Water may not thus be gathered into reservoirs for future use, when it may best suit the convenience and use of one riparian owner, and thus deprive other riparian owners of their use and service of the stream in its natural condition, unless such right is exercised under a valid prior appropriation."

It is plain, therefore, that the use of the stream by defendant was adverse and not in the exercise merely of a riparian right. The use was as much adverse and could have been as readily enjoined as if the diversion had been to another watershed for use on nonriparian lands.

The holding in the case of *Pabst* v. *Finmand*, 190 Cal. 124 [211 Pac. 11], when properly understood, is not in conflict but in accord with these views. It is true that if an upper proprietor is making a certain use of the stream, which may or may not from the face of the act, be intended as an adverse claim against the proprietor below, it

will, when the use is under inquiry, be presumed to be a riparian and not an adverse one, until facts are brought home to the lower proprietor showing the use above to be adverse. This must be true because of the long line of cases which hold that the lower riparian proprietor may enjoin a nonriparian use on the stream above him even though no present damage is done upon the ground that such use may ripen into a prescriptive right. (See 26 Cal. Jur., pp. 538, 539, where the cases are collected.)

The foregoing discussion is in reality but a confirmation of the reasoning of this court in *Herminghaus* v. *Southern California Edison Co., supra,* on practically a parallel state of facts, the only difference being that in that case the court found the storage to be an unreasonable exercise of the riparian right while here we have impliedly a contrary finding. The facts are not in dispute. The question is then one of law. In describing the situation in the above-cited case, Mr. Justice Richards uses this language (200 Cal. 110, 111 [252 Pac. 607, 619]): " . . . and as to said waters as a whole and to the extent of their retention in said reservoirs, their ultimate return to the river would depend not at all upon the claims and asserted rights of lower riparian owners to the usual, natural, and ordinary flow of said waters, but altogether upon the will and convenience of the defendants in their proposed utilization of said waters for power production." And in portraying the legitimate result of the reasoning employed by defendant in behalf of the right of storage, he uses the following language: "The asserted right of the defendants herein as riparian owners along said river and incidentally the asserted rights and claims of all those who have appeared herein as *amici curiae* claiming similar rights in similar rivers in this state would, if permitted, put an end to the whole doctrine of riparian rights, not only as to these plaintiffs and all other lower riparian owners similarly situated, but also as to the defendants themselves; since any person or aggregation of persons having the financial ability and acquiring a riparian ownership in lands above those of the defendants along the yet higher reaches of said river would thus become entitled to exercise all the rights which the defendants are here claiming, even against them, with the resultant drying up of the defendants' own reservoirs."

The essence of the riparian right for power, therefore, is that the land owner is entitled to the benefit of the hydraulic effect of the natural flow of the stream measured by its drop from the highest point to the lowest on his land. He, too, may make such temporary detention in forebays or reservoirs as will insure him this right, but a detention of surplus water above his needs, from a wet season to a dry one, when he may utilize it, is not a use of the stream as it flows and is in plain violation of the correlative rights of proprietors below. ■ The defendant thus possessing prescriptive rights in the stream, they are conclusively presumed to be injurious to the riparian right of plaintiff. (See authorities cited in 26 Cal. Jur., *supra*.) If then the riparian right has suffered a damage, in that it has been invaded by prescription, in a valuation of the real property thus affected, this fact must be considered.

At this point respondent replied that, conceding a prescriptive right to have been acquired, that fact is unavailing here as the storage of the storm and natural waters of the stream in the manner carried on by defendant and their release in the manner done by it were and are a distinct benefit to plaintiff in that the flow of the stream was equalized and made uniform, pointing to the fact that 581.05 second-feet was the average flow during the summer months of July, August and September; that in the period of high water and when the dam was closed, the tributaries below the dam furnished this constant amount of water so that at all times and during all seasons plaintiff has enjoyed a constant, steady flow at its lands of 581.05 second-feet; that it owns a prescriptive right to 106 second-feet and has an uncontestable right to 475 second-feet as riparian proprietor. This position is specious, but is it sound?

■ In the first place, a diversion of the whole stream during the time of the influx of tributaries below the dam and above plaintiff's land would not injure plaintiff in the least, as its prescribed quota of the water would not, during such period be disturbed. Again, under this theory, plaintiff is not benefited unless this undisturbed factor comes to the rescue and compensates it for the water taken by defendant. It is, therefore, unjust to defendant to have this influx below, which it will not and could not disturb, capitalized and made to swell the injury resulting to plain-

tiff from the proposed taking. ■ Moreover, the water right that plaintiff is entitled to have considered is its water right in a state of nature or, in other words, on the stream as it is wont by nature to flow, and not in a stream which defendant by an immense outlay has regulated to provide uniformity of volume and duration. It seems, in other words, that defendant may have been assessed with damages for bestowing a benefit on the plaintiff. Again, grave question exists as to the right of the jury to assess damages on the basis of a riparian water right in 475 second-feet of water, constant and uniform flow. No stream in a state of nature would yield any such uniformity. ■ Indeed, the riparian right is in its nature a tenancy in common and not a separate or severable estate. The moment a right in a natural stream is specifically defined in a concrete inflexible amount, at that moment the right becomes one of priority and not riparian. This question was before the Oregon Supreme Court in the case of *Caviness* v. *La Grande Irr. Co.*, 60 Or. 410 [119 Pac. 731, 735], where it was said:

"In the very nature of things, a court cannot fix in advance by its decree what quantity of water will be reasonable in the future for the use of a riparian proprietor claiming the duty of water in that character. . . . The reason is that among riparian owners the contingencies of the future are so many and varied respecting the amount of rain or snow fall, the heat or humidity of summer, the alternation of crops, and the like, that it is quite impracticable, if not impossible, to determine in advance the question of the duty of water for each riparian owner. Besides, a decree of that kind would be a virtual partition of the water from an estate in common to one in severalty, although there would be no rule whereby the estate of any single owner could be determined, owing to the unknown factors already noticed." (See, also, to the same effect, *Little Walla Walla Irr. Co.* v. *Finis Irr. Co.*, 62 Or. 348 [124 Pac. 666, 670, 125 Pac. 281].)

In *Pabst* v. *Finmand, supra,* at page 129 of 190 Cal. [211 Pac. 11, 13], it is said: "A riparian owner is entitled to a reasonable amount of water for use on his riparian lands. What is a reasonable amount varies with the circumstances of each particular case and also varies from

year to year, for the amount which might be reasonable in a season of plenty might be manifestly unreasonable in a season of drought.''

But, in this case, the whole evidence was founded upon and the jury instructed upon the supposed right of plaintiff to a constant, invariable specific quantity of water. This basis is necessarily artificial, impossible and admittedly is the result of a computation of averages during three special months over a long period of years. The evidence shows that many years this average did not obtain. Constancy and uniformity are most valuable elements in producing electric current by the use of water power. The evidence of such discharges during such period is, of course, admissible, but the jury should not be told that plaintiff as a riparian owner was entitled to any specific concrete amount of water. In other words, the right is riparian and not a prescriptive or other prior one. The necessary conclusion from the above facts is that the verdict of the jury in fixing damages in this cause cannot be sustained.

The same is also true of the judgment respecting injunction, entered following said verdict. The language of the paragraph relating thereto is as follows: ''That the defendant be and it is hereby enjoined and restrained from storing, withholding or diverting the waters of the North Fork of the Feather River as to reduce the flow thereof below 581.05 cubic feet per second.'' This clause is based upon a similar finding and it cannot be sustained by the evidence. It requires defendant to allow 581.05 second-feet of water to pass through the outlet of its dam at all times. Admittedly this is contrary to the evidence of the right above discussed and sustained, which attached by prescription. The court found that 581.05 cubic feet of water measured the flow to which plaintiff was entitled through its lands, which was quite a different matter for between the dam and plaintiff's lands during certain seasons of the year large quantities of water flow into the stream from tributaries so that this number of second-feet measured at plaintiff's lands and at the dam are quite different things. In fact, the dam is practically closed for certain periods of the year. Defendant might for a number of months during the year close the dam entirely and still plaintiff would have his

581.05 second-feet of water. The judgment, therefore, in this respect cannot be sustained.

These conclusions make it unnecessary to consider the question as to whether the extent of the prescriptive right of plaintiff is or is not 4,240 miner's inches or 106 second-feet. This finding is based upon evidence which at another trial may be different and from which different conclusions might be drawn by the trial court. The same observation is true with respect to the defense of estoppel for this claim too is founded solely upon a question of fact, the evidence on which may or may not be the same on a second hearing. For the same reason it is unnecessary to determine whether a discovery was made upon the Addie Bell claim prior or subsequent to the year 1902. We prefer to leave all questions not inconsistent with the views herein expressed open so as not to prejudice either party upon retrial of the case. It must be said, however, that the testimony as to the plans of plaintiff to use said waters, the extent of the project and the probable cost thereof, were not proper matters to be considered by the jury in assessing damages (*San Joaquin & King's River Canal & Irr. Co.* v. *Stevinson,* 63 Cal. App. 767 [220 Pac. 427]). The court also on request should have told the jury that the value of the property to plaintiff with or without the water right, was not the basis, but the market value alone with and without the water right, was the basis of damages.

The judgment is reversed.

Richards, J., Curtis, J., Seawell, J., Langdon, J., and Waste, C. J., concurred.

Shenk, J., concurred in the judgment of reversal.

Rehearing denied.

Shenk, J., and Curtis, J., dissented.