[Civ. No. 597. Fourth Appellate District.—February 27, 1933.]

A. H. REVIS, Respondent, v. I. S. CHAPMAN & COMPANY (a Corporation), Appellant.

O'Connor & Findlay for Appellant.

Emery B. Tyler for Respondent.

AMES, J., *pro tem.*—This action was brought for the purpose of recovering damages caused by the alleged draining of plaintiff's land by the defendant. A trial by jury was had, in which plaintiff was awarded damages in the sum of $2,500, and from the judgment entered thereon defendant prosecutes this appeal.

Since May, 1909, respondent had been the owner of approximately ten acres of land located in that portion of San Bernardino County known as the artesian belt, and which is aptly described in the opinion of the Supreme Court in the case of *Katz* v. *Walkinshaw*, 141 Cal. 116 [70 Pac. 663, 667, 74 Pac. 766, 99 Am. St. Rep. 35, 64 L. R. A. 236]. The westerly half of this land is not involved here. The easterly half is described as low, damp, swamp-land which, under normal climatic conditions, was saturated with water. The respondent testified that upon the surface of his land there was a deposit of red soil varying from eighteen inches to two feet in depth, beneath which was a stratum of peat from twelve to fourteen inches in depth, and beneath that two other strata of peat varying in depth from six to sixteen inches, between which there existed stratifications of silt and sand varying in depth from eight to twelve inches. The general slope of the land is from a northeasterly to a southwesterly direction. The water in the soil is not a part of any stream or subterranean course, but was naturally percolating through the soil. Prior to the operations of appellant, which are hereafter described, water stood freely upon the surface of the ground and within ditches constructed thereon. The presence of the deposits of peat within this soil renders crops planted therein unusually prolific.

The land south of and adjacent to the respondent's property, consisting of about ten acres, together with about thirty acres lying east of and adjacent to respondent's property, is owned by appellant. Upon this property appellant has been engaged for several years in removing the peat deposits from its soil for the purpose of manufacturing fertilizer for commercial purposes, and which is, after its

manufacture, removed from the premises of appellant and used for fertilization of the soil in other communities.

Respondent testified that along the south side of his land there was a bluff or elevation from ten to twelve feet in height. In the fall of 1927 appellant removed this elevation, and along the north line of its property constructed a ditch approximately five feet in depth. This ditch throughout the transcript is referred to as ditch "A", and throughout this opinion will be so identified. In the winter of 1927 appellant constructed a ditch along the south line of its property, parallel to and about two hundred feet south of ditch "A", which, in the transcript, is referred to as ditch "B", and which will be so identified in this opinion.

In 1924 respondent owned, in addition to the land here involved, the property south of and adjacent to it, which he subsequently conveyed to his wife, and of which appellant is now the owner. He testified that the character of the soil in that parcel of land was similar to the land still owned by him and which is involved in this action. In 1924 he first farmed that portion of his property which is now owned by appellant. During that year he planted crops of melons, peanuts, popcorn and other agricultural products. The crops planted that year proved to be unprofitable, with the exception of his crop of peanuts, which, he testified, yielded profitable returns, and that the land upon which his crops were planted, together with the land now owned by him, continued to yield profitable crops until the drainage of his land was accomplished by appellant as hereinafter described.

Respondent further testified that he continued to raise profitable crops until the construction of ditch "A" and ditch "B"; that after the construction of appellant's ditches the water which had formerly saturated the strata of peat in his lands sunk to a level of five feet below the surface of the ground, as a result of which the peat became dry and the land unproductive; that it was impossible to raise crops upon his land without artificial irrigation. An expert witness, who had been a resident of the artesian area for many years, testified that after water is withdrawn from peat it gets very hard, cracks form in it and "that it seems impossible to get it wet". That before crops could be grown a saturation of the peat would be necessary and that

this could not be accomplished with surface irrigation. Respondent further testified that a portion of the surface of his land sunk by reason of the removal of water from the substrata of the soil; that an artesian well, which formerly flowed on his premises, dried up. Other evidence was introduced tending to prove that the drying of respondent's land was due to the operations of appellant which, however, it will be unnecessary to summarize here.

Appellant, on the contrary, contends that the drainage of respondent's land was not due to its operations but to a series of dry years and the lowering of the water-plane in the artesian area due to heavy draughts upon the supply therein contained. The evidence in this respect is in sharp conflict and presents a question of fact for the jury, but appellant further contends that the operations conducted upon its land was a reasonable use of the land and that, conceding that such operations resulted in the drainage of respondent's land, he has no cause of action against appellant.

The doctrine of reasonable use was established in this state in the case of *Katz* v. *Walkinshaw, supra,* and has been cited and reaffirmed in many decisions since that time. In that case Mr. Justice Angellotti, in quoting from the case of *Pixley* v. *Clark,* 35 N. Y. 520 [91 Am. Dec. 72], says: " 'An owner of the soil may divert percolating water, consume or cut it off with impunity. It is the same as land, and cannot be distinguished in law from land.' He says this proposition must be admitted, but nevertheless a case cannot be found in this country 'where the right has been upheld in the owner of land to destroy a stream, a spring or a well upon his neighbor's land, by cutting off the source of its supply, *except it was done in the exercise of a legal right to improve the land, or make some use of it in connection with the enjoyment of the land itself*'."

In *Hudson* v. *Dailey,* 156 Cal. 617 [105 Pac. 748, 752], the court says, with respect to percolating waters: "The general rule, as now established by the decisions of this court, undoubtedly is that where two or more persons own different tracts of land, underlaid by porous material extending to and communicating with them all, which is saturated with water moving with more or less freedom therein, each has a common and correlative right to the use of this water upon

his land, to the full extent of his needs if the common supply is sufficient, and to the extent of a reasonable share thereof if the supply is so scant that the use by one will affect the supply of the others."

The same principle has been reaffirmed in many decisions in this state. Among them may be cited *Cohen* v. *La Canada Land & Water Co.*, 142 Cal. 437, 439 [76 Pac. 47]; *Montecito etc. Co.* v. *Santa Barbara,* 144 Cal. 578, 585 [77 Pac. 1113]; *Burr* v. *MacClay Co.*, 154 Cal. 428, 434 [98 Pac. 260]; *Barton* v. *Riverside Water Co.*, 155 Cal. 509 [101 Pac. 790, 23 L. R. A. (N. S.) 331].

█ In the instant case appellant had a correlative right to use a reasonable share of the water percolating under the surface of its soil for any beneficial use upon its land. The evidence showed, and the jury impliedly found, that the quantity of water removed from respondent's land greatly exceeded its reasonable proportion of that drained from the common source. Nor was the water so drained from respondent's soil used to fulfill the needs of appellant. To the contrary, its presence within the soil of appellant was a detriment to its manufacturing operations and was removed from its land and wasted. Under the conflict of evidence which the record in this case presents, it was proper for the court to submit to the jury the question as to whether or not the drying of respondent's land was caused by the operations of appellant.

█ A more serious contention is advanced by appellant with respect to the measure of damages proved to have been sustained by respondent. Evidence was introduced at the trial which tended to prove the revenue derived by respondent from his various crops both before and after the construction of appellant's ditches. There is also evidence in the record showing the expense of irrigation necessitated by the drying up of the land. The jury could have properly considered this evidence in determining the damages sustained by respondent by reason of the loss of his crops, and other losses proximately sustained as a result of the drainage of his land, if such had been pleaded. On the subject of damage, the complaint contains only the *ad damnum* clause alleging the general damages sustained. We think the loss of his crops and the expense incurred in irri-

gating them are in the nature of special damages which must be specifically pleaded.

In *Gomez* v. *Reed,* 178 Cal. 759 [174 Pac. 658], the court says: "Damages which are the necessary consequence of the wrongful act can be recovered under the general allegation of the amount of damage inflicted. (*Treadwell* v. *Whittier,* 80 Cal. 579 [22 Pac. 266, 13 Am. St. Rep. 175, 5 L. R. A. 498].) But where there are different elements of damage flowing from the wrong and the amount of damages from each element is capable of exact statement 'the defendant has the right to be informed of the amount of the claim for each, so that he might be prepared with evidence at the trial to meet the claim'. (*Mallory* v. *Thomas,* 98 Cal. 647 [33 Pac. 757]; *Lamb* v. *Harbaugh,* 105 Cal. 690 [39 Pac. 56].) And if damages ensue because of some particular circumstances existing at the time, though the natural consequences of the wrongful act in connection with the special circumstances, the facts must be specially alleged."

Under the rule established in this case, we think that the damage sustained by loss of crops and the expense incurred in the irrigating of the same are special in their nature and must be pleaded.

■ Respondent testified that before the ditches were dug by appellant his land was worth $5,000 an acre; that the crops which he had produced prior to the construction of such ditches yielded eight per cent on an investment of $5,000 per acre. The following appears in the transcript: "Q. Since the drainage of your land how much is that land worth? A. It is not worth the taxes. Q. Is it good for anything? Is it good for pasturage? A. Absolutely not."

Again he testified that it was worth a little for pasture in the winter; that formerly the grass would grow upon the land in the summer-time sufficient for pasturage during the entire winter, but that since the construction of appellant's ditches the ground is barren and bare, and that a good deal of Bermuda grass had died within the last two years. There is no evidence in the record, other than the foregoing, upon which the jury could determine the amount of damages sustained. Since, then, such expenses cannot be recovered in this action, we are confronted with the question

as to whether or not the evidence is sufficient to prove the general damages alleged in the complaint.

The measure of damages in California for an injury to the realty is the difference between the market value of the land before and after the damage was sustained. (*Perkins* v. *Blauth*, 163 Cal. 782 [127 Pac. 50]; *Seneca Cons. Gold Mines Co.* v. *Great Western Power Co.*, 209 Cal. 206 [287 Pac. 93, 70 A. L. R. 210].)

While there is evidence of the value of this land prior to its drainage, there is no evidence whatever from which the jury could have drawn an inference as to the market value of the land subsequent to that time. It is true that respondent testified that since the drainage of his land it was not worth the taxes. Clearly, that would furnish the jury no criterion upon which to base its opinion as to the value of the land. Whether the taxes were high or whether they were low does not appear from the transcript. It is possible that with a high rate of taxes the land would still possess a considerable market value. Respondent testified that it was not good for pasturage, and again he testified that it was worth a little for pasturage in the winter. There is nothing in this statement to indicate what the market value would be.

In the case of *De Freitas* v. *Town of Suisun City*, 170 Cal. 263 [149 Pac. 553, 554], plaintiff sued for damages resulting from the drying of certain springs in his land caused by the construction of a tunnel by the defendant upon the land belonging to it. The court announced the following rule for determining the measure of damages: "The measure of damages caused by the diversion of water from plaintiff's springs would be the difference between the value of plaintiff's land before the diversion complained of and its value if it were permanently deprived of the water so diverted."

The court again says: "Gross income does not determine value. It might be all used up in expenses, in which case, upon the theory proposed, the land would be worthless, although its actual market value might be considerable."

The court again says: "The truth is the amount of actual net revenue does not determine the value of land in every case. The revenue would vary according to the industry, skill and wisdom of the person cultivating the land. Its

net revenue, assuming reasonable skill in cultivation and management, would be the criterion, so far as that element alone is concerned. But other elements, such as the state of the market, the demand and supply of land of the character in question, the prospects of advance, and perhaps other things, would ordinarily affect the question of value and fix it at a sum different from that produced by capitalization of net revenue. The actual market value is the thing to be determined, and while net revenue should be considered, it does not, in general, furnish a conclusive measure of such market value. In the present case, however, the questions, both as to value and damage, were framed upon the erroneous theory that value may be determined from gross revenue alone, and neither of them should have been allowed.''

We think the rule announced in that case is peculiarly applicable to the case at bar. The judgment is reversed.

Barnard, P. J., and Jennings, J., concurred.