PERSON *v.* JOHNSON.

4-9306

235 S. W. 2d 876

Opinion delivered December 11, 1950.

Rehearing denied February 12, 1951.

*Shaver, Stewart & Jones* and *L. K. Person,* for appellant.

*T. B. Vance* and *Keith & Clegg,* for appellee.

GRIFFIN SMITH, Chief Justice. Bailey Johnson sought to quiet title to that part of the bed of Cypress Lake lying north and east of the center line.[1]

The questions are (1) whether Johnson's purchase included, as a matter of riparian law, that part of the

---

[1] Johnson's wife was a party to the action. The land is in the northeast quarter of Section 29 and the south half of the northwest quarter of Section 28, etc., in Miller County.

lake bed to which he lays claim, leaving to L. K. Person as owner of land on the south a similar right, thus preventing Person from projecting his line to the north shore of the lake. In the alternative (2) it is contended by Johnson that an old fence had, by common consent, been recognized as the dividing line. Each litigant traces title to a partition suit instituted by John W. Dryden in 1895, but Person insists that subsequent transactions, wherein deeds and mortgages were executed, expressly described his boundary as the north shoreline, thus depriving Johnson of the interest he would otherwise have as a riparian proprietor. It is stipulated that the lake is non-navigable.

When the Dryden partition suit was filed, William P. Parks, the heirs of Cassius Leigh, and L. A. Byrne as trustee, were owners of undivided interests in the northeast quarter of section 29 and other lands. A decree shows the appointment of commissioners, their report that the property was apportionable in kind, the filing of exceptions, and an amended report by the commissioners conforming to the exceptions. The amended report was based upon consent of all that the land should be divided in the manner shown by detailed descriptions; whereupon it was approved and ordered to be recorded.

The land awarded Johnson's predecessor contains 89.06 acres, while Person's predecessors in title received 35.15 acres. Appellants contend that the effect of a stipulation was to eliminate from consideration the partition decree, and that the agreement was that the respective claims would go back to the title of Mattie D. Parks. Under this contention the entire northeast quarter of section 29 was conveyed to Byrne as trustee in 1887, and [say appellants] Byrne conveyed to Medora B. Candler all of the lake bed lying in the described area, and Mrs. Candler and her husband conveyed to Mrs. C. W. Person, appellant's mother.

Our construction of the stipulation is that it permitted the introduction of all deeds and other matters in the recorder's office. This would include the court's orders and decrees relating to the partition suit.

On October 10th, 1949, after the trial resulting in this appeal had been concluded, Mrs. C. W. Person undertook to intervene. She alleged that in December, 1943, she leased to the Amerada Petroleum Corporation ". . . all of the bed of Cypress Lake lying within the fractional northeast quarter of section 29, containing 35.79 acres, more or less." There was warranty of title. Oil was discovered, with royalties payable to L. K. Person, the grantor's son. The trial Court sustained a motion to strike the intervention—upon the theory, no doubt, that its consideration would require an entirely new trial or exhaustive supplemental hearings on allegations not previously made.

In her intervention Mrs. Person called attention to the partition suit, then asserted that deeds were not actually issued. It is claimed by L. K. Person that partition was not completed, therefore no final decree resulted.

Appellants think the Chancellor erred in not giving to certain record transactions the effect they contend the law would imply. They say it is clear from the Candler deed that the intention was to convey not only the 35.15 acres south of the lake, but to extend the grant (as the words express) to the north boundary of the lake. This property was mortgaged in 1923 to the St. Louis Joint Stock Land Bank under the same description. A commissioner's deed of 1934 vested title in S. L. Cantley as receiver for the Land Bank, and in 1935 the receiver conveyed to Mrs. Person. In 1946 Mrs. Person quitclaimed the lake bed to L. K. Person.

Appellees have invoked Rule 9, complaining of the insufficiency of appellant's abstract. In the reply brief the pleadings are abstracted, but it is insisted that the testimony has been fairly presented, and appellants stand on this alleged completeness.

The testimony is brought into the transcript on 112 typewritten pages. In dealing with it for the purpose of making an abstract, the attorney[2] has interspersed ex-

---

[2] L. K. Person is a member of the Arkansas Bar and perfected and prosecuted his own appeal and the appeal of Mrs. C. W. Person.

planatory comments, and has so sketchily shown what
the witnesses testified to that a satisfactory understand-
ing of the factual issues would require each member of
the Court to read the entire record, as distinguished
from the briefs and abstract. To determine whether the
evidence has been substantially abstracted, the writer of
this opinion read the transcript, with the result that it
cannot be fairly said that all of the essentials have been
appropriately dealt with. For example, a fence was built
by Dan W. McClure. L. K. Person testified that he com-
plained to McClure, who took the fence down. Question:
"They did not repair any part that he took down."
A. "I don't know. If Mr. McClure took the fence down
there would not be any fence to repair?"

To understand the importance of testimony relating
to the fence, Drainage District No. 2 must be mentioned.
It was organized in 1916 with Dan W. McClure as presi-
dent of the board of commissioners, Mrs. C. W. Person
as secretary, and A. W. Duke as the third member. The
purpose was to drain Cypress Lake (sometimes called
Wynn Lake) and lands to the east by diverting the waters
into Kelley Lake. Bonds aggregating $8,000 were sold.
Mrs. C. W. Person was paid $559.02 (as an auditor's
report disclosed) for "private ditch condemned." Jesse
Smith, a defense witness, had testified that Dan McClure
caused a fence to be built "down the middle of the lake
between the old Dryden place and the Candler place," but
McClure did not keep the fence in repair; that McClure
"probably" took down a part of it in 1921—"it seems
like some of it was taken down [but] I don't remember
about that."

Appellant's abstract mentions the testimony of Eben
McClure, Dan's son, found at pages 138-52, 195-98, and
314-16. There is no abstract of McClure's direct testi-
mony on recall. As part of the examination the question
was asked, "Do you know  . . .   that any part of the
fence in the middle of the lake was taken down in 1921?"
A. "No, sir. . . .  Calvin Davis and I worked the
Dryden place in 1922 and I did not notice that any part
of the fence had been taken down then."

In treating this testimony as unimportant for abstract purposes, appellants discuss testimony by Eben that followed immediately on cross-examination, emphasizing the part seemingly favorable, but omitting explanatory comments that the trial Court no doubt considered. The abstract shows that the witness testified that the middle of the ditch was considered the center of the line except at the "far end" where [the ditch?] got over. There was a narrow place in the lake, "and [the line] got a little farther on the land Mrs. Person owned on the opposite side of the lake." But this is not all of the answer made by the witness, who went on to say that the line, after encroaching on Mrs. Person's property, "dwindled out into a big wide basin on the far end. There it got on the southeast corner of the Dryden place and the northeast corner of the Candler place. From there on the lake went out and curved; one part went on the Person place about where the line of the Dryden place is, and the other—it came in the little narrow place."

While being cross-examined ·on recall the witness was again asked if he noticed that any of the fence had been taken down. The answer is copied in 19 typewritten lines of the bill of exceptions, not abstracted.[3] The transcript shows that when McClure gave the lengthy answer printed in the margin (footnote No. 3) Mr. Person said, "I think you are mistaken about it. I believe you are thinking about the old fence. The Negroes pasturing the cows built it." Answer by the witness: "I am not mistaken. I know about that particular fence. If there is any question about a fence, *that* is the only one I know anything about. Unless you have cleared [the land] in

[3] Question: "Did you notice any of the fence taken down?"

A. "[Mr. Person], right where the six acres of land were [my father's land between Dr. Candler], you know it came from the cutoff from due west to that north part of the line where the Candler place— where it joined the cutoff. You know the Dryden land ran 'plumb across' some 50 yards south of the ditch. It went into the cutoff place, made a turn, then followed the south bank of the lake south of the ditch. I don't know how it got back to the center of the lake there. It followed that way until, I think, it hit the Dryden line. I tried to work that land from the slope of the bank down to the new barn. Some old Negroes lived there a long time. The road came out of a patch of sandy land. It is still there, north of the old house."

the last few years, there is a thicket . . . right in there where they pulled all the stumps on the south side of the lake—where all the cypress trees run into your field."

A great deal of testimony by other witnesses is not abstracted. We must therefore assume there was a' basis for all factual matters necessary to the Court's determination, and that the decree in such respects is supported by a preponderance of the evidence.

Appellees' position is that the property claimed by Johnson was described in the pertinent conveyances as being north of Cypress Lake, and until Byrne as trustee executed his deed there had been no attempt to treat the Person property as a tract extending to the north bank of the lake. When Person testified that his deed showed "35.15 acres and the lake bed." the Court asked: "You say it would show that prior to the time Byrne conveyed the land? Prior to the time Byrne owned it [did the deeds] show the lake bed?" A. "No, sir."

Appellants summarize the record in this way: After L..K. Person acquired facts regarding the fence he spoke to Dr. Candler about it, making the point that it should not be maintained for seven years, and the Doctor took part of the fence down, probably in 1921. At that time Person informed Dr. Candler of his claim of ownership extending to the north bank of the lake. Person paid his mother's debt to the Joint Stock Land Bank, and in this deed the description went to the north lake shore. This occurred in 1935, and [said Mr. Person] "since that time my mother has been in legal possession, slightly—just the slight acts Jesse [Smith] talked about on the witness stand."

Appellees argue that the Cantley deed was a quitclaim. The language was, "grant, sell, and convey" and there was no warranty. When the deed was executed the Land Bank was mortgagee. Foreclosure was not begun for nearly six months. Considerable acreage other than that purchased by Mrs. Person was included in what is termed the Smith and Blocker mortgage. It embraced

the land later acquired by Johnson. Person argues that because conditions of the trust deed had been broken, thus giving to the holder of the security the legal right to sell under power conferred by the instrument, it was immaterial that the receiver sold privately to Mrs. C. W. Person, for the private grantee acquired all interest the mortgagee took under the subsequent foreclosure. So, says Person, "the Court will presume that was done that should have been done, [therefore] insofar as appellees are concerned the sale was regular and valid."

We quite agree that the sale was valid and that it conveyed any equity the Land Bank then had, but it does not follow that any of the parties had in mind an obvious invasion of riparian rights. While the expression "to the north bank of Cypress Lake" circumscribed the boundary, the law extended Johnson's property to the center of any non-navigable waters touched by the land itself when the dispute relates to ownership by a proprietor on the opposite shore. *Gill* v. *Hedgecock,* 207 Ark. 1079, 184 S. W. 2d 262.

Until a comparatively recent period the lowlands of this area were not thought of in terms of appreciable value. The drainage ditch, while serving private purposes, was a statutory undertaking and its construction would not alone have the effect of marking individual property rights. But the Chancellor had evidence from which it could be found that the fence was a recognized partition, irrespective of testimony that in some places it had been torn down and that at other points maintenance was not observed. *Gregory* v. *Jones,* 212 Ark. 443, 206 S. W. 2d 18. The Chancellor did not think either side had established adverse possession. The Court appears to have predicated the decree on a belief that there was an agreed boundary, and that the trustee's deed —assuming it undertook to extend the southern proprietor's rights to the north bank of the lake—was not treated in that sense, possession remaining as fixed by law.

Appellants complain of the Chancellor's finding that the fence was built and maintained by tenants of Mrs.

C. W. Person. There was testimony to that effect, but whether it preponderated, or whether treated as a mere circumstance, is not controlling. This is true because, without an appropriate abstract of testimony, there is a presumption that the evidence sustained particular findings. From this Court's standpoint Mr. Person is not to be criticized for his abbreviated abstract. He had a right to select what to him appeared to be the substance of what all of the witnesses testified to; but, if in taking this course he passed on to this Court the presumptions attaching to the decree with its necessary implications, there can be no just complaint that we have not waived our rules, thereby assisting a litigant who expressly asserted reliance on the abstract after attention had been directed to its incompleteness.

To avoid effect of the partition decree of 1895 there must have been an appeal, a statutory proceeding to set the order aside, a timely bill of review, or a showing in the collateral attack here made that the Court was without power to act in respect of the subject-matter or parties. Failure, in the action relied upon, to show that deeds were executed, cannot prove fatal where rights of innocent purchasers are not the issue. A case in point is *Graham* v. *Graham*, 199 Ark. 165, 133 S. W. 2d 627. It was there held that if a court having jurisdiction rendered a decree requiring execution of a deed, the deed—insofar as rights of the parties are concerned—is unimportant; for, said Judge MEHAFFY, "[if the appellant Graham] was directed by the Court to deed the property to Mattie Graham, and there was no timely appeal from such order, title would vest without further formality, the deed being only the evidence or muniment of what had been done." [See Ark. Stats., §§ 29-126, 29-127, and 29-128; Leflar, Conflict of Laws, § 25.]

Time strengthens presumptions that a judgment or decree is valid. *Parsley* v. *Ussery*, 198 Ark. 910, 132 S. W. 2d 1. A decree confirming the commissioners' report in a partition proceeding is final. *Robertson* v. *Cunningham*, 207 Ark. 76, 178 S. W. 2d 1014. Analogous is the holding in *Dumas* v. *Owen*, 210 Ark. 505, 196 S. W.

2d 987, where effect of the confirmation of the report of a judicial sale is discussed. Confirmation, it is said, concludes any issue that might have been raised.

In the case at bar predecessors in title of the interested parties here filed their exceptions, procured an amended report, then agreed that the Court should partition. When the exact land was described in respect of each litigant, with the judicial direction that it become property of the several petitioners, respondents, and exceptors, this was binding upon them and their subsequent grantees.

A case that at first glance appears contrary to our holding here is *Kilgo* v. *Cook*, 174 Ark. 432, 295 S. W. 355. Kilgo was the owner of 12 acres in the bed of War Eagle Creek except two or three acres that had formerly contained a mill. The mill was destroyed and other structures were erected. The original government survey did not take notice of the creek, but included all of the area as land. Cook owned 30 acres east of War Eagle, his western boundary being the east bank of the stream. The acreage contended for by Kilgo was described in his deed, with certain measurements reading, ". . . thence east across War Eagle Creek to the east bank of same," etc.

In the opinion written by the late Judge McHANEY it was held that Cook was not a riparian owner. It was then said: "Of course if appellee was a riparian owner on an unsurveyed or a meandered non-navigable stream he would take title to the middle or thread of the stream." There was added the further statement that "It [is] a proposition of law, well settled by the former decisions of this Court, that owners of land bordering on a non-navigable stream or lake, where the government survey meandered the boundary lines thereof, making fractional sections along the bed or shoreline of such stream or lake, such owners acquire title to the middle or thread of such lake or stream." The case is cited by Jones on Titles, § 349.

In the instant case there are fractional surveys and Cypress Lake was meandered, distinguishing the facts from *Kilgo* v. *Cook*.

When the decree had gone against the defendants they undertook to procure a new trial by bill of review, alleging false testimony, the discovery of certain records, etc. We do not think there was an abuse of judicial discretion in denying the petition.

Affirmed.