Marcella NILSSON *v.* Howard M. LATIMER et ux

83-201                                        664 S.W.2d 447

Supreme Court of Arkansas
Opinion delivered February 6, 1984
[Rehearing denied March 12, 1984.]

*Steven G. Nilsson,* for appellant.

*R. David Lewis,* for appellee.

STEELE HAYS, Justice. Marcella Nilsson, appellant, and Howard Latimer, appellee, are landowners having a common boundary — the Little Cossatot River and Mill

Slough. Nilsson sought a declaratory judgment to interpret the language of the deed of each party and to determine their respective rights to the stream bed, contending that Latimer was not a riparian owner. Each owner also claimed damages from the other for unreasonable uses of the water. The Chancellor found Latimer to be a riparian owner and that neither party had made unreasonable use of the water. On appeal, we affirm.

Nilsson's land was acquired in two conveyances, one to Nall's Island (lying between Mill Slough and the Little Cossatot) and the other to certain lands lying "west of the Little Cossatot River." Nilsson's argument that Latimer is not a riparian owner is based not so much on the strength of her own deeds as on the following wording in Latimer's deed:

> . . . and running North 2236 links to the left bank of Little Cossatot River, then meandering up stream with left bank of said stream to the mouth of the Mill Slough, thence up stream with left bank of said slough . . .

Nilsson believes that because Latimer's land is described by a call *to the bank* and not to the river, Latimer did not receive title to any part of the bed of the stream and, therefore, is not a riparian owner. We disagree with the argument. The general rule in Arkansas, as in other jurisdictions, is that riparian landowners on a non-navigable stream take title to the thread, or center of the stream. *Gill* v. *Hedgecock,* 207 Ark. 1079, 184 S.W.2d 262 (1944); *Thompson on Real Property,* § 3075. The question to be settled here is how that rule is affected by the terms of a deed describing that part of the land bounding the water.

It has long been a rule of property that absent an express reservation by the grantor, a conveyance of riparian property conveys title to the thread of the stream unless a contrary intention appears or is clearly inferrable from the terms of the deed. *Gill* v. *Hedgecock, supra; Kilgo* v. *Cook,* 174 Ark. 432, 295 S.W. 355 (1927); *Thompson, supra,* §§ 3075, 3083; 78 ALR 3d 604; 78 ALR 597. There is some disagreement,

however, as to what terms will express a contrary intention sufficient to rebut the general presumption. There is authority that land described as bounded "along the bank" or by some call in reference to the bank, or to the low-water mark, will exclude title to the bed, while a call to the river will not. But we believe the better rule of construction is that the grantee takes title to the bed, irrespective of whether the call is to the river or to the bank, if there is no specific reservation of the bed by the grantor, or a clear manifestation of such intent. The policies supporting such a rule are sound, as it is far less likely that the grantor would have any reason to retain title to the bed, where he has not reserved it, and that strip of land would be of much greater value to the grantee. Moreover, if the rule were otherwise, it would result in many instances in portions of the river beds to which title would remain in an unsettled state. We think this result is consistent with our holding in *Person* v. *Johnson*, 218 Ark. 117, 235 S.W.2d 876 (1951) and *Gill* v. *Hedgecock, supra.*

Nilsson places some reliance on *Kilgo* v. *Cook, supra,* a case involving disputed riparian claims. There, the language in Cook's deed described the land bordering on the eastern edge of the water as ". . . to War Eagle Creek, thence down War Eagle Creek . . .", whereas Kilgo's deed purported to give him title to the entire stream bed. On appeal, Cook was held not to have title to the stream bed on the distinction that War Eagle Creek had not been meandered by the original government survey. Similarly, the Little Cossatot and Mill Slough were not meandered and Nilsson contends, therefore, that Latimer is precluded from any title to the bed. But we find that the distinction made in *Kilgo* was based on a misconception, because while a meander line completed by the government survey is prima facie evidence that the owner of the adjacent land takes to the thread of the stream, there is, however, no reverse presumption that a stream *not* meandered presumes no title to the bed. See *Little* v. *Williamss,* 88 Ark. 37 (1980). Under the facts of *Kilgo* and the case before us, it is immaterial that a non-navigable stream was not meandered when determining title to the bed. The erroneous distinction in *Kilgo* resulted in confusion, as subsequent cases reflect. *Person* v. *Johnson, supra; McKee* v. *Gay,* 226 Ark. 585, 293 S.W.2d 450 (1956). Although

*Person* made the same distinciton as *Kilgo,* the result was consistent with our finding here, as the *Person* court construed language "to the Northern bank" in the more liberal manner, as we have done in this case. A later case, however, *McKee* v. *Gay, supra,* used a more restrictive approach, and construed language "to the low-water mark," as precluding any bed ownership. *McKee* took no notice of the previous decision in *Person,* but relied instead on the distinction made in *Kilgo* and on a Wisconsin case to support a narrow construction of the language. To the extent that *Kilgo* and *McKee* are in conflict with our holding today, they are overruled.

We are nonetheless in agreement with the result in *Kilgo.* Both parties had derived their title from a common grantor, Kilgo's title being acquired prior to Cook's. Kilgo's deed conveyed approximately fifteen acres, twelve of which formed roughly a rectangular parcel running through the bed of the stream. Kilgo's deed read:

> . . . Thence West across War Eagle Creek . . . Thence South with War Eagle Creek . . . Thence East across War Eagle Creek to the East bank of same, thence Northerly with said bank . . .

We find this language sufficient to defeat the general presumption of riparian rights which would ordinarily have attached to Cook's deed under the circumstances of the case. Both parties took from a common source, and Kilgo's deed, which was prior to Cook's, expressly conveyed the entire bed of the stream. Thus, Cook took with notice that his boundary was the *bank* of the river and the general presumption that the language in his deed would otherwise create was overcome. Whereas, in this case there was no prior conveyance from which Latimer would take notice that title to the thread of the stream would not pass with his deed.

Nilsson also contends that even if Latimer is a riparian owner, his use of the water was unreasonable. But the trial court's finding was to the contrary and we cannot say it was clearly erroneous. In *Harris* v. *Brooks,* 225 Ark. 436, 283 S.W.2d 129 (1955), we adopted the "reasonable use" theory

of water rights, although recognizing that definite guideposts do not exist, leaving much to judgment and discretion. We said:

> . . . Use of the stream or water by each proprietor is therefore limited to what is reasonable, having due regard for the rights of others above, below or on the opposite shore. . . . It is axiomatic in the law that individuals in society must put up with a reasonable amount of annoyance and inconvenience resulting from the otherwise lawful activities of their neighbors in the use of their land. Hence it is only when one riparian proprietor's use of the water is unreasonable that another who is harmed by it can complain, even though the harm is intentional.

This dispute arose during an exceptionally dry year and two or three water holes on the river were pumped dry by Latimer's irrigation pumps. The riparian right that Nilsson was deprived of was occasional recreational fishing at those particular pools, arguably an insignificant amount overall. We stated in *Harris* that recreational and commercial uses were of equal status, and we affirm that view. However, we cannot clearly determine from the record that the deprivation suffered by Nilsson was more than negligible, and it is impossible to say that it went beyond the "reasonable amount of inconvenience and annoyance" which may be imposed upon one riparian owner by another when riparian rights compete. It should be noted that claims of lower riparian owners are not involved here.

On cross appeal, Latimer argues that an award should have been granted for damages to his land from overflow caused by Nilsson's low-water bridge. Although there seems to have been some flooding on Latimer's land, there was not sufficient proof to show that the flooding was related to the presence of the bridge. The weight of the testimony indicates that the bridge had no great effect on the extent of flooding which would otherwise have occurred. We must accept the findings of the trial court which are not clearly wrong. *Stokes* v. *Stokes,* 279 Ark. 44, 648 S.W.2d 478 (1983). The arguments of neither side afford a basis for such a conclusion.

It is unnecessary to reach the other points raised by the appellant.

Affirmed on direct and cross appeal.

HICKMAN, J., dissents.

DARRELL HICKMAN, dissenting. This is a case involving water rights. The trial court and the majority pass over rather lightly the fact that the appellees, who own over 1,000 acres of land next to this nonnavigable stream, depleted several large holes of water to irrigate some of it. Not all their land could be described as riparian. The appellant, a riparian owner across the creek, had the same rights to use those holes of water as the appellees and had the right to prevent their destruction. I would reverse the trial judge on this issue and award some damages to the appellant.

The appellees did not own this water, although they acted as if they did. A riparian owner does not own the water flowing past his land. 1A G. W. Thompson, Commentaries on the Modern Law of Real Property § 261 (1980). Although the creek had ceased to flow because of a drouth, I see no change in their rights. They merely have the right to use it without damaging the rights of other owners. *Seneca Consolidated Mines Co.* v. *Great Western Power Co.,* 209 Cal. 206, 287 P. 93 (1930). Neither party owned the fish in the stream. *Medlock* v. *Galbreath,* 208 Ark. 681, 187 S.W.2d 545 (1945). The fact that appellant may have wanted to use the holes to fish is enough to find he was deprived of that right however slight it may have been. A riparian owner does not abandon his rights merely because he doesn't use them. *Smith* v. *Morganton,* 187 N.C. 801, 123 S.E. 88 (1924). A drouth is a severe problem to all farmers. But a few holes of water from a small creek are not going to save a large crop. The damage doe to this creek by completely drying up the holes may have been far worse than the short term gains by the farmer.

In a broader sense, we have reached the time in our state when we have to start thinking seriously in terms of a

scarcity of water and of the competing interests for our water which must be fairly reconciled. No longer can we assume there is an abundance of water there for everyone's taking for any and all purposes. We now know that most of our water actually belongs to no one. Subterranean water constantly moves, small branches create nonnavigable streams, which, in turn, create navigable bodies of water. All are interrelated and affected by any damage to the other.

The general assembly, an appropriate body to resolve these problems, has so far failed to deal with them in any definitive way. It would be better if they addressed the problem in a comprehensive way rather than if we settled all the conflicting interests in a case by case way.