[Sac. No. 4291. In Bank.—February 25, 1931.]

ANGELE BAZET, Respondent, v. NUGGET BAR PLACERS, INC. (a Corporation), Appellant.

608

H. R. Given and Carr & Kennedy for Appellant.

Dozier & Kimball, F. J. Solinsky and Edw. R. Solinsky for Respondent.

SEAWELL, J.—This appeal involves a controversy between respondent and appellant as to the first and superior right of said parties herein to the use of the waters of the East Fork of Stuart's Fork of the Trinity River and Strope Creek, respectively, which are of first importance to conducting and carrying on hydraulic mining operations. Strope Creek is a tributary of the East Fork of Stuart's Fork of the Trinity River. The East Fork of Stuart's Fork of Trinity River, which is the main stream, will, for the sake of brevity, hereafter be referred to as the East Fork. The mining claims belonging to or in the lawful possession of said parties, both as to patented and unpatented claims, are within adjacent areas, situate in Minersville Mining District, county of Trinity. No question as to title or the possessory rights of either party is involved in the appeal.

Beginning with some time prior to the month of December, 1898, Fred Beaudry, the former husband of respondent, patented eight and located twenty-one other mining claims

in said district which he began operating and continued to operate intermittently until his death, which occurred in 1912, by the use of such waters as were appendant or appurtenant to said mining claims, or which were acquired by prescription or user, together with the diversion of large quantities of waters from said East Fork, a stream of considerable volume, and Strope Creek. Respondent, as the widow of said Fred Beaudry, succeeded to his entire interests. After his death six additional mining claims were located in 1914 and 1915, which also form a part of the mining properties of respondent.

It was claimed at the trial and found as a fact by the court that for more than ten years immediately preceding June 14, 1913, to wit: June 14, 1903, respondent's said predecessor in interest became, and she as his successor in interest now is, the owner of the first right to divert and use all the waters of said streams to the extent of 6,000 miner's inches of the first flow of East Fork and 2,000 miner's inches of the first flow of Strope Creek, measured under a six-inch pressure, and is entitled to divert the entire flows of said streams at such times as either or both of said streams should from natural causes become diminished below the amounts awarded by the judgment to respondent. In the month of September, 1922, appellant entered into the possession of a group of mining claims situate at a point below the confluence of Strope Creek with said East Fork, and began to operate them. All of appellant's claims are riparian to said East Fork, while none of respondent's claims is riparian to said East Fork. Said Fred Beaudry, respondent's former husband, during the early period mentioned, in preparing to engage in hydraulic mining operations intercepted the waters of North Fork by constructing a wooden dam across said stream at a point several miles northerly from the situs of his own mining activities and approximately an equal distance from the situs of appellant's present mining claims and conducted the waters of said stream into a system of ditches and waterways which he constructed. The water first enters North Fork ditch, a portion of which feeds the Greenhorn Ditch and its branches, and the remaining portion continues southerly, intercepting and transporting in its course the waters of Strope Creek. From that point it takes the name of Diener

Ditch. In its lower reaches it ramifies into branches known as the Ridgeville Ditch, Upper Ditch and Lower Ditch. Respondent's diversion works and conduit system consists of dams and headgates, ditches, old creek channels, flumes and ravines. The system is quite primitive in construction and there is, no doubt, some wastage of water in the course of transportation. An ancient ditch or watercourse called Unity Ditch parallels the East Fork in its southerly course which water was diverted by appellant by means of a dam constructed across said stream. It seems that it had fallen into disuse until appellant recently restored it. This dam is located a number of miles southeasterly from respondent's dam and several miles northerly and upstream from appellant's operative grounds. Said Unity Ditch in its course southerly crosses Strope Creek at a point near its confluence with East Fork.

On June 14, 1923, and again on July 3, 1923, appellant obstructed the flow of water of East Fork into respondent's intake and diversion works, which obstructions, and threatened obstructions, resulted in the commencement of this action, in which it was adjudged that respondent had a legal right and claim to take and divert, and that she owned, 6,000 miner's inches, measured under a six-inch pressure, of the first flow and was entitled to the first right to divert and use said quantity of the waters of the East Fork, and also 2,000 miner's inches of the waters of Strope Creek, similarly measured, and for similar purposes, during all seasons of the year from January 1st to December 1st inclusive for operation and development work in and about said mines, including ten miner's inches thereof for irrigation and domestic purposes. Respondent's title was quieted to the extent of said quantities of water against any and all claims of appellant, and appellant was perpetually enjoined from maintaining any dam or obstruction in the channel of said East Fork or Strope Creek, or in any way interfering with the flow of the waters of either or both of said streams into respondent's diversion works, or to or upon her mining properties, to the full amounts awarded by said judgment. The judgment further decreed that appellant is entitled to divert and use 2,500 miner's inches of the waters of said East Fork, measured under a six-inch pressure, during all seasons of each year for mining purposes upon appellant's

mining properties, over and above and subject and subordinate to the 6,000 miner's inches of the first flow of said stream which was awarded to respondent. This award was doubtless made to accord with the permit issued to appellant by the State Department of Public Works, Division of Water Rights, on February 6, 1923, granting to appellant, subject to prior vested rights, the right to divert by means of the Unity Dam and ditch 2,500 miner's inches of water from East Fork and Strope Creek, and was not intended to limit appellant in the exercise of its riparian rights, but only as an appropriator. The state by its permit designated the amount of water that appellant might take at the point of diversion, and the court made it plain that it did not in anywise modify the Water Commission's order. As a matter of fact the appellant was awarded the full quantity of water asked for in its answer by means of Unity Ditch, subject, however, to the first right of respondent to receive the quantity which the decree awarded her. The only impediment placed in appellant's way as far as receiving the quantity asked for, is said first right of respondent.

From the decree as above outlined the appeal was taken by Nugget Bar Placers, Inc., a corporation, assigning a number of grounds as constituting reversible error. Appellant concedes respondent's claim to the ten miner's inches of water awarded to her for irrigation and domestic purposes and makes no complaint as to that portion of the decree. Respondent concedes that error was committed inadvertently in the judgment which provides for the measurement of said awarded quantities of water to be made under a *six-inch* pressure rather than a four-inch pressure, and consents that the judgment be modified to the extent of basing the award upon a four-inch pressure to conform with the proofs, and as so modified asks that the judgment be affirmed. ▮ Complaint is also made to the order of the court reopening the case for the reception of further evidence after both sides had announced that neither had any further evidence to offer, wherefore the court made a written announcement of its decision to the effect that respondent was entitled to judgment awarding her the first flow of the waters of the East Fork and Strope Creek, in the same quantities and measured by the same pressure as set forth in the signed decree herein, but limited the period of use from

May 1st to November 1st of each year, and awarded to appellant the first flow of all the waters of said streams during the months from November 1st to May 1st of each year, and also to all the waters flowing in said streams without limitation as to quantity in excess of the amounts awarded to respondent during the period from May 1st to November 1st of each year. No findings or decree had been signed binding the court to its informal decision, and some time thereafter and before findings and conclusions of law or judgment had been prepared or signed, the court made an order setting aside said decision and reopened the case for the single purpose of receiving evidence as to whether during the months of November, December, January, February and March of each year, beginning with November 1, 1913, to and including April 1, 1923, there had been sufficient water flowing in said streams to conduct and operate the mining properties of respondent as a hydraulic mine as the same had been operated for many years prior to November 1, 1913. The reason given for reopening the case was that the evidence was silent as to an important matter. We see no abuse of discretion on the part of the court in reopening the case for the reception of additional evidence on an important branch of the case, and it does not appear that the appellant was surprised or was in any manner prejudiced by the court's action. The cause was still within the control of the court. Whether the evidence introduced upon the reopening of the case supplied the deficiencies pointed out by the court could not affect the question of the reasonable exercise of judicial discretion. This brings us to the consideration of the more substantial assignments of error.

Appellant insists that a proper regard for the fundamental rights of a riparian land owner to the use of at least a portion of the waters of a stream which flows over its lands as against a nonriparian owner who asserts the right to use all the waters of such a stream, founded upon user, appropriation or prescription, imposes upon such a claimant the *onus* of establishing her claim by evidence more convincing in effect and more definite in character than the evidence which has been adduced by respondent in support of her claim. Especially it is contended that the evidence impels, at least, a reasonable partition of said waters, regu-

lated by hours of use or a limitation as to quantity. Appellant further contends that whatever rights respondent may have acquired from 1903 to 1913, were lost by nonuse and abandonment during the period from 1913 to the commencement of this action, which was filed in 1923, and that the evidence does not sustain the finding that respondent or her predecessor used the waters of either of said streams in the operation of hydraulic or placer mines continuously or consecutively for the statutory five years' prescriptive period at any time during her ownership or the ownership of her predecessor either as to the quantity or for beneficial or useful purposes as found by the court, or that said waters were used for mining or other beneficial purposes during any month from November to May of the succeeding year during the entire term of occupancy and ownership of respondent and her predecessor. It is also earnestly contended that said mines were at no time operated as such for a consecutive period of five years from November to May·of each succeeding year. This contention has not been satisfactorily met. It cannot be successfully contended that respondent's mines were operated as such from May to November of any year beginning with 1903 and ending at the time suit was filed, to wit August 3, 1923. But very little work of any kind was done in or about said mining claims during any month or season after the death of Fred Beaudry, the original owner, which occurred in 1912. No claim is made that any work was done upon the properties for more than a year after his death. The only work done during the ten years succeeding his death was occasional ground sluicing, piping and such annual assessment work as was necessary to protect respondent's rights. The Diener flume, which had a carrying capacity of approximately one-half of the waters of the two streams combined, went out in the winter of 1914–1915 and was never restored. A portion of the flume of the Lower Ditch went out in 1912 and was restored in 1922 to a carrying capacity of about 500 inches. Appellant complains, not entirely without reason, that no actual measurements were ever made and no data or other information. is to be found in the record by which any estimate may be made as to the quantity of water Strope Creek carried at any season. It is admitted that East Fork Ditch, under a four-inch pressure, has a carrying capacity

of the amount of water respondent claims to have diverted, but it is disputed that the balance of the equipment had such capacity or that said amount of water was applied to a useful or beneficial purpose, the burden of so doing being upon plaintiff, respondent. On the other hand respondent contends that she and her predecessor used the full maximum quantity of waters, to wit, 6,000 miner's inches, which debouched from the East Fork into the intake of the East Fork Ditch, and 2,000 additional inches at a point lower down, necessary in the reasonable operation and developing of her mining claims, from 1903 until she was prevented from continuing operations by reason of an extended period of insufficient fall of rain and snow in the mountain regions which reduced the flow of said streams to a point where it was impossible to operate her mines by the hydraulic process, or from doing any kind of work other than occasional ground sluicing. This period of marked decrease in the water supply, it is contended, began with the year 1913 and continued for a period of approximately ten years with the possible exception of one or two years when storm conditions were somewhat normal. There is testimony to the effect that in some years the snow packs dropped from the normal depth of four feet to twelve or sixteen inches. Respondent sought to excuse the shutting down and practical suppression of operations during said period to changed weather conditions rather than to any fault chargeable to her. One or two witnesses produced by her testified that the flow of water in said streams at certain seasons of certain years was as low as 300, 500 and 1,000 miner's inches. Testimony was also adduced on her part that it was necessary to close the headgate of North Fork Ditch during the winter and early spring months in order to protect the flumes and lower ditches from damage which would result from the debris and detritus which the torrential storms would have brought with them. The country in which the mines are located is mountainous and rugged. The area of the watershed which feeds the streams is some ten or twelve square miles. The extent of the mining operations carried on by respondent or her predecessor were at no time extensive, and at no time does it appear from the evidence that the number of workmen employed exceeded six or eight men, and the inference is that at times there was not more than one

employee, if any. The development work was begun by Fred Beaudry in 1903. Some of the claims were worked by tenants for periods of one, two and three seasons. It appears that Beaudry did some hydraulic mining at intervals and in a limited fashion through the years of his occupancy; and that three giant monitors were brought to the property at different periods. Appellant contends that said giants could not have handled anything like 8,000 miner's inches of water. It appears that some tunneling was done upon the original Beaudry claims and a sawmill of unknown capacity was early constructed upon said premises which it is claimed cut 115,000 square feet of timber for flume repairing and other purposes in 1915. No evidence has been pointed out in the briefs showing that said mines ever produced precious metals in paying quantities or at all. The results of ground sluicing, which was practically the only method claimed to have been used from 1913 to 1923 as a mining process, were kept out of evidence upon the objection of respondent. In an effort to rebut the claim that any ground sluicing had been done in good faith (1913–1923) and that if any water not under pressure was used to flood the surface of any of the claims as indicating ground sluicing, it was done as a mere pretense as no ''clean-ups'' or sluice-boxes were ever made, and consequently no accounting could have been made as to any gold or other precious metals obtained from such a process. While we are of the view that said excluded testimony was admissible, we are not prepared to say that its exclusion was of sufficient importance of itself to justify a reversal. The principal witness for respondent was a graduate engineer, J. F. Bovier, and a nephew of respondent. He was frequently upon the premises during the lifetime of Mr. Beaudry, and after his death he became the manager or agent for respondent. His testimony shows beyond question that the headgate of the East Fork Ditch was closed from November first of each year until approximately May first of the succeeding year during the ownership of both Fred Beaudry and respondent. Further, that the mining season, under the weather conditions which there existed, began with May and concluded before the close of the year. The greatest shortage of water was suffered during the fall and winter months, and the high flows were during the freshet seasons of the

spring and the summer months, June, July and a part of August, before the snows had melted completely under the heat of the spring and summer months. It is very apparent, as the record now stands, that neither Fred Beaudry nor respondent acquired either title to or a right to use all of the waters of East Fork, or did use said waters during a considerable portion of the year measured from November 1st to April or May 1st. Appellant's counsel during the progress of the trial conceded that the evidence showed that the mining season began usually in May,—some years in April. This question, on the state of the record before us, is not open to controversy. ▮ Respondent never acquired a prescriptive right to the use of waters during a period in which she did not use said waters, at least as to the quantity for which she here contends. This question has been settled by many decisions of this state, and there is no difference where waters are sought for irrigation purposes or for any one of the many industrial affairs of the state. The value of water is too great to permit it to be withheld from use. The principle, reduced to what may be termed its minutest terms, is clearly set forth in *Northern California Power Co.* v. *Flood,* 186 Cal. 301 [199 Pac. 315, 317], where it is said: "The evidence leaves the question of the use of the water during the night time uncertain, not showing clearly whether the continuous use spoken of was during the day only or both day and night of the entire irrigating season. The value of water for irrigation is too great in this state to allow a landowner to gain a right thereto for the entire twenty-four hours of each day by using the same for only a half or any other portion of the time less than the whole. If he has used it continuously for a certain period each day long enough to gain a prescriptive right to such use, he would have the right only for that period and he could not lawfully object to the use by others of the flow during the intervening time of each day." We find it rather difficult upon the evidence to convince ourselves that respondent or her predecessor ever used the entire volume of 8,000 miner's inches of water for useful purposes on the Beaudry premises. There is a very serious question as to whether the ditches and flumes had a capacity to carry more than 6,800 to 7,000 miner's inches. Next it is not pointed out what beneficial uses this vast quantity of

water could have been applied to. That some water was devoted to beneficial uses and that such uses have grown into a legal right there is no doubt, but there is grave doubt as to the need of respondent for the quantity of water which she would have awarded to her. Counsel on both sides have elaborately briefed the law as to the means and methods by which the appropriative and prescriptive uses and rights of a nonriparian appropriator of the waters of a stream may be lost to a riparian owner. It is respondent's contention that the right to the use of water once acquired by prescription becomes a vested, absolute right which cannot be lost or divested by nonuser, howsoever long said use be discontinued. We do not deem that question controlling in the instant case for the reason that the first question here for determination is whether the appropriative rights of respondent ever ripened into a prescriptive right. In short, does the evidence show, first, that she or her predecessor ever used all of said waters during the months above pointed out, and, second, did said parties devote the full quantities taken to a useful or beneficial purpose? Those are the main points upon which the reversal is urged. ■ We cannot agree with the proposition that one whose appropriation right has developed in a prescriptive right may permit water thus appropriated to run to waste for an indeterminate period as against riparian owners upon the stream who can use it and have undertaken to put said waters to a beneficial use. This contention is contrary to the spirit and purpose of section 20a of the State Water Commission Act (Stats. 1917, p. 746) and is not in harmony with a long list of decisions of the courts of this state. The rule applicable to this case is well stated as follows in *Lindblom* v. *Round Valley Water Co.,* 178 Cal. 450 [173 Pac. 994, 996]: "The theory underlying section 1411 . . . is thus explained in the decision on the first appeal in *Smith* v. *Hawkins:* 'Considering the necessity of water in the industrial affairs of this state, it would be a most mischievous perpetuity which would allow one who has made an appropriation of a stream to retain indefinitely, as against other appropriators, a right to the water therein, while failing to apply the same to some useful or beneficial purpose.' (110 Cal. 127 [42 Pac. 454].) The reasoning is as applicable to the situation of the parties in this case as it was to that of the

opposing claimants in *Smith* v. *Hawkins*. There, as here, a valid appropriation had been made while the land below the point of diversion was still a part of the public domain. There, as here, a part of that land, bordering on the stream, had passed into the ownership of one claiming a superior right in the flow as against the prior appropriator who, it was asserted, had failed to apply the water to a beneficial use. The defendant's position is not strengthened by resting its right on the basis of prescription. All it could acquire, by diverting or impounding the water, was a usufructuary right (Wiel on Water Rights, 3d ed., sec. 18), not an ownership in the *corpus* of the water, except, perhaps, so much thereof as it has actually reduced to possession in its reservoir. The matter here in dispute is not the ownership of any particular quantity now impounded, but the right to dam and control the water as it runs into and through Round Valley. Storage of water in a reservoir is not in itself a beneficial use. It is a mere means to the end of applying the water to such use. (Kinney on Irrigation, 2d ed., p. 1480.) ▮ The defendant's prescriptive rights do not extend to the impounding of the water for the mere purpose of holding it in storage. If, then, the defendant has ceased for a period of more than five years to apply to a beneficial use any part of the water so retained and impounded by it, the considerations of public policy pointed out in *Smith* v. *Hawkins, supra,* demand that it shall not be permitted to continue the diversion and storage of the excess over its legitimate needs, and thus prevent the application of such excess to the needs of others who, if there had been no impounding by the defendant, would have been entitled to use it. The evidence in this case fairly shows that for a period of more than five years before the commencement of the action the defendant had not applied to beneficial uses all of the water so impounded by its dam and reservoir. While there is some suggestion in the evidence that the defendant supplied water for irrigation, as well as for mining purposes, the record indicates very clearly that the service of water for irrigation was too trifling to be worth considering.'' Doubtless there is considerable seepage of water through the East Fork Dam built to prevent the flow of water down the main channel to appellant's mining properties as its construction is of boulders and

earth material, but the greater volume of the stream's flow is held back by the obstruction.

The mining section involved is within the country known and designated as the "Weaverville Quadrant." Appellant, in rebuttal of testimony offered by respondent as to the depletion of the waterflow from 1913 to 1923 called a witness who was, and for many years had been, generally familiar with the weather, water and mining conditions of said area, and proceeded to examine him as to the rain and snowfall in other portions of said area, to which objection was sustained. The mountain areas being generally similar in climatic conditions, we are of the view that said evidence should have been received.

We fully appreciate the difficult problems which the judge of the trial court was called upon to decide, but after a considerable time spent in the examination of the questions presented we are of the opinion that a better adjustment of the conflicting claims of the litigants could be made upon a retrial.

For the reasons above assigned the judgment is reversed.

Curtis, J., Shenk, J., Waste, C. J., Richards, J., Preston, J., and Langdon, J., concurred.

Rehearing denied.