[Sac. No. 5338. In Bank. Aug. 27, 1943.]

C. F. MOORE et al., Appellants, v. THE CALIFORNIA OREGON POWER COMPANY (a Corporation), Respondent.

Carter, Barrett & Carlton, Daniel S. Carlton and Oliver J. Carter for Appellants.

Brobeck, Phleger & Harrison and James S. Moore, Jr., for Respondent.

CURTIS, J.—This is an appeal by plaintiffs from a judgment notwithstanding the verdict entered for defendant in an action brought by plaintiffs upon a complaint setting forth two causes of action. Upon the first cause of action the plaintiffs asked for an injunction restraining the defendant from interfering with plaintiffs' riparian rights to the waters flowing in the Klamath River. Upon the second, the plaintiffs asked for damages alleged to have been sustained by them by reason of the acts of defendant in depriving them of their riparian rights to the waters of said river. The plaintiffs abandoned their action for an injunction as the defendant had, prior to the commencement of said action, devoted the waters of the river to a public use.

Plaintiffs are the owners of lands which are admittedly riparian to Klamath River situated in the county of Siskiyou. Some years prior to the commencement of this action, the predecessors of the defendant built a dam at Copco in the bed of the river about ten miles above the lands of the plaintiffs. The dam was completed in 1917, and the waters of the river were by means of this dam impounded and used for furnishing power to operate a power plant constructed at Copco. This plant was built and operated for the generation of electric power to be sold, and which was sold, to the public in the various localities in the vicinity of said plant. The dam thus constructed in 1917 was raised in 1922 to a height of 126 feet and a second unit of the plant was placed in operation. The plant at Copco will be referred to as Copco No. 1.

The reservoir back of the dam at Copco has been kept full, and though it has a capacity of 85,000 acre feet of water, only the upper 5,000 acre feet is available for use in the op-

eration of the plants. The dam is what is known as the high-head type, the outlet being located near the top of the dam. Normally only the upper five feet of the water in the reservoir is used. Since the completion of the dam and the generating plant at Copco, and in the year 1925, a second plant known as Copco No. 2 was installed downstream from Copco No. 1, in which the waters of the river after their release at Copco No. 1 have been utilized for the operation of Copco No. 2. The dam at Copco No. 2, however, does not detain or impound the water, but simply allows it to pass through the plant and then down the river. Since the construction of these plants they have been used continuously by the defendant for the purpose for which they were constructed. They are all located on riparian lands belonging to defendant. The plaintiffs admit that defendant has gained a prescriptive right to use the waters of the river during the nighttime and during holidays and Sundays of each week, but contend that up to the year 1931, they received ample water for all riparian purposes in a constant and regular flow during the daytime. This action was begun in 1933.

The defendant in its answer, while making certain denials of the various allegations of plaintiffs' complaint, pleads the statute of limitations and contends that it has gained by prescription the right to the entire flow of the river at its Copco plants, having used the same openly, continuously and under a claim of right for over five years prior to the commencement of this action. Practically the sole question before us is whether plaintiffs' cause of action is barred by the statute of limitations. It is conceded the five year period of limitation applies in this case.

The evidence shows without substantial conflict that following the construction of the dam at Copco, and up to the irrigating season of 1931, there was at all times except during the nighttime and on Sundays and holidays, a uniform and ample supply of water flowing in the river at the head of plaintiffs' ditch to supply all the water needed for the irrigation of plaintiffs' lands. However, there was evidence which tended to show that commencing with the irrigating season in 1931 and during that and the subsequent years, plaintiffs were not able to use the waters of the stream upon their lands. The inability of plaintiffs to so use the waters of the river during that year was due, so the plaintiffs contend, solely to the manner in which defendant retained and released

water from its reservoir at its Copco No. 1 plant. The year 1931 was an exceedingly dry year and the waters of the stream were unusually low. However, the defendant released all the waters impounded by it in its reservoir during that year, and the waters so released flowed down to and along plaintiffs' lands. There is no evidence that defendant diverted any of the waters of the stream from the river bed except by means of its reservoir, and as we have seen, the waters so diverted and impounded in its reservoir were released downstream to plaintiffs' lands. This statement also applies to the release of waters from the reservoir after said year. Following the year 1931 were years of ordinary rainfall. There is no claim of any unusual water shortage in the river after 1931, but the evidence shows that while the defendant released all the waters flowing in the stream after they had been stored in its reservoir, the manner in which it released the waters caused the stream below its plants to so fluctuate that plaintiffs' diversion works were continually washed away, with the result that plaintiffs were unable to use practically any of said waters upon their lands. The plaintiffs made repeated attempts to repair and even to reconstruct their diversion works, but they were washed away the following day, or in at least a few days thereafter, by the unusually large flow of water discharged at intervals by defendant from its reservoir into the river above the intake of plaintiffs' ditch. This occurred in 1931 as well as in the years following 1931.

On one occasion occurring in 1931, the plaintiff, Charles F. Moore, testified as follows: ''I built a dam out at the head of the ditch and plowed and scraped channels at the head of the ditch and tried to pick up more water. Q. And did you get any from that method? A. No, sir, the next day after we completed the first ditch, the dam washed away and the ditch filled up. Q. That is, by this big head of water that came down? A. Yes, sir.'' This condition prevailed during the irrigating season following the year 1931.

It is this fluctuation of the stream caused by the manner in which the defendant has, beginning with the year 1931, discharged the water from its reservoir, that has deprived the plaintiffs of the use of necessary water for the irrigation of their riparian lands, and for which they were awarded damages by the verdict of the jury in this case. ██ Defendant contends that it has operated its plant since 1931 in the

same manner in which the plant was operated prior to that year, and that it has released the water from its reservoir for that purpose in the same manner and in the same regular quantities as in previous years. The evidence in support of that contention only creates a conflict with that of the plaintiffs, to the contrary effect. This conflict must be resolved in favor of the plaintiffs in view of the verdict of the jury. It is not seriously contested by defendant that such an injury to plaintiffs' riparian rights would entitle them to damages unless the defendant had, prior to the year 1931, gained a right by prescription to so discharge and use the waters of the river in the manner and to the extent shown above.

It might be well at this time to give further details respecting the manner in which the defendant operated its Copco No. 1 plant. The defendant only released water from these plants when there was a demand for power by its customers. According to the statement of its vice-president: "The plant would begin to pick up load as soon as the customers begin to throw switches and the industries pick up load in the morning . . . from 6 o'clock until 8 in the morning, and increased from then on until our normal peak is reached about 11 or 11:30 in the morning; sometimes a little earlier, 10:30 to 11:30. . . . During the noon hour, it usually drops and then picks up again in the afternoon, not as high a peak as in the morning, and it continues until 4 or 5 o'clock in the afternoon. Then there is another drop-off in the load in the late afternoon which is picked up in the evening, and continues until 9 or 9:30 in the evening, when it begins to drop off very rapidly until midnight, and then there is a minimum interval between midnight and 6 o'clock in the morning. . . . Saturday afternoons and Sundays and holidays are normally considered off peak; . . . the Copco No. 1 [plant] is operated with an automatic governor."

The use of the waters of a stream in their passage through the land of a riparian owner to operate a power plant thereon to generate electric power is as clearly within his rights as is his right to operate a mill thereon to grind grain, or to operate any other machinery than which there is no more ancient or well-established feature of riparian rights. (*Mentone Irr. Co.* v. *Redlands etc. Co.,* 155 Cal. 323, 327 [100 P. 1082, 1083, 17 Ann.Cas. 1222, 22 L.R.A.N.S. 382]; *Fall River Valley Irr. Dist.* v. *Mt. Shasta P. Corp.,* 202 Cal. 56, 70 [259 P. 444, 56 A.L.R. 264]; *Seneca Cons. Gold*

*Mines Co.* v. *Great Western Power Co.,* 209 Cal. 206, 215 [287 P. 93, 70 A.L.R. 210].)

The electric energy thus generated may be conveyed for use on nonriparian lands. (*Mentone Irr. Co.* v. *Redlands etc. Co., supra.*)

However a riparian owner has no right to erect machinery requiring for its propulsion more water than the stream furnishes at its ordinary stages and operate such machinery by accumulating the water. (*Clinton* v. *Myers,* 46 N.Y. 511 [7 Am.Rep. 373]; *Seneca Cons. Gold Mines Co.* v. *Great Western Power Co.,* 209 Cal. at page 217, cited above.) Nor may he gather waters of the stream into a reservoir for future use, when it may best suit his convenience, and thus deprive another riparian owner of the use of the waters and service of the stream in their natural condition. (*Still* v. *Palouse Irr. & Power Co.,* 64 Wash. 606 [117 P. 466, 467]; *Seneca Cons. Gold Mines Co.* v. *Great Western Power Co., supra,* page 209.)

Under the law as announced in these decisions it has been held that the seasonal storage of water in a reservoir—that is, the storage of water during the wet season to be used during the dry season of the year—is not a proper exercise of riparian rights. In the language of the decision last cited where the defendant, a riparian owner, was making such a use of the stream, it was stated: (page 217) "It is plain, therefore, that the use of the stream by defendant was adverse and not in the exercise merely of a riparian right. The use was as much adverse and could have been as readily enjoined as if the diversion had been to another watershed for use on nonriparian lands." To the same effect is *Colorado Power Co.* v. *Pacific G. & E. Co.,* 218 Cal. 559, 564 [24 P.2d 495], and many other cases decided by this court. In the Colorado Power Co. case the court emphatically stated: (page 564) "Seasonal storage of water for power purposes is not a proper riparian use, but constitutes an appropriation, so that if it continued for the time prescribed by the statute of limitations, it will ripen into a prescriptive right."

There is no contention that the storage of the waters of Klamath River by the defendant at its Copco plant is a seasonal storage of said waters. As shown above by the statement of facts in this case, the waters of the river are stored by the defendant in its dam at Copco and used by defendant

as needed in the operation of its plants located at that point in the river. They are released by the defendant from its reservoir only when it is operating its plant at Copco Plant No. 1. The condition produced by the operation of the plant at Copco No. 1 is probably best described by the plaintiff C. F. Moore as follows: ''Q. By the way Mr. Moore, are you familiar with the operation of the Copco No. 1 power plant? A. Yes, sir. Q. How many years have you been familiar with the operation of that power plant? A. Since 1921. Q. And just tell the jury what you have observed; that is, your own experience in going there and watching the operation of the plant? A. Well, the operator is notified by a telephone to pick-up load, or drop load. When they pick-up load, that means to turn the water loose and let it go downstream and when they drop load, they shut up and stop the water. Q. Have you been actually present when that operation was taking place? A. I have right in the plants. Q. On many occasions? A. On numerous occasions, yes, sir; not of late years, but previous years. Q. Now, in 1931 when the river was dry or practically dry at the head of your ditch, to which you have heretofore testified, did you make any investigation of the conditions existing between this Copco No. 1 Dam? A. I have. Q. What did you do? A. I visited a number of times with the operators, and saw water backed up above the dam numerous times. Q. How near was it to the top of the dam? A. Well, within a few feet. Q. Of the top of the dam at Copco No. 1? A. Yes, sir. Q. What did you observe with reference to water being backed up above that dam? A. Well, the lake was almost full. Q. For what distance could you see water in this lake above the Copco dam? A. I would say two miles and a half or three miles. Q. And that was during 1931? A. Yes, sir. Q. Were you also there in 1932? A. Yes, sir. Q. Was that during the irrigation season? A. It was. Q. And what did you observe in regard to conditions existing then with reference to the reservoir or lake being full of water? A. It was full of water. Q. At those times what was the condition down at your place with reference to being water in the river at the head of your ditch? A. We had no water. Q. Was the channel dry? A. The channel at the head of the ditch was absolutely dry. I drove around the lake when the water was nearly in the road on the north side of the lake. Q. And was that during the daytime, Mr. Moore? A. Yes. Q. Now, you say you drove around

the lake when the water was nearly in the road. Is there a road around that lake. A. Yes, sir; it crosses at the head of the lake. Q. And the road follows close to the water did it. A. Yes, sir. Q. And when did you do that? A. I did that in 1931 and 1932 both. Q. When; during the summer time? A. Yes, sir. Q. And what was the condition with reference of there being water in the river at the head of your ditch at that time? A. There wasn't any. Q. That is, the river was dry? A. The channel that went by the head of the ditch was dry. There was some water in the east channel."

While this evidence relates particularly to the years 1931 and 1932, the condition under which the defendant released the waters from its reservoir before that date was not materially different from that prevailing during those two years. The record shows that from the time the plant No. 1 at Copco was completed in 1922, the defendant assumed the right to use the entire flow of the stream in the operation of its plant, and under this claim it actually stored and thereafter released all the waters of the stream in the operation of its plants at such times and in such manner as best suited its convenience and its needs.

The manner in which the defendant stored and released the waters of the river at its Copco Plant No. 2 was admittedly a proper riparian use of said waters. (*Mentone Irr. Co.* v. *Redlands etc. Co., supra,* and other cases cited.) But the storage, retention and use of the waters of the river at Copco No. 1 was radically different from that at Copco No. 2. As we have seen, the waters at Copco No. 1 were retained for an indefinite period of time, and at times when the bed of the river below its plant at Copco No. 1 was dry. Moreover, no water in any substantial quantities was released during the nighttime, nor on Sundays or holidays. As we have seen, it was released to meet the convenience and needs of the defendant in the operation of its plants. Such a use of the waters of a stream deprives the lower riparian owners of their rights to the usual, natural and ordinary flow of the stream.

A riparian owner "has no right to erect machinery, requiring for its operation more water than the stream furnishes at an ordinary stage, and operate such machinery by [accumulating the water and] discharging [it] upon those below in unusual quantities. . . ." (*Clinton* v. *Myers,* 46 N.Y. 511 [7 Am.Rep. 373].) This case is approved in *United P. B.*

*Co.* v. *Iroquois P. & P. Co.,* 226 N.Y. 38, 45 [123 N.E. 200], and in *Seneca Cons. Gold Mines Co.* v. *Great Western Power Co., supra,* page 216. Water may never be thus gathered in a reservoir for future use when it may best suit the convenience and use of one riparian owner, and thus deprive other riparian owners of their use and service of the stream in its natural condition, unless such right is exercised by a valid prior appropriation. (*Still* v. *Palouse Irr. & Power Co., supra.*) That case is also approved by the Seneca case, *supra,* in which the court concludes (page 217) that such a "use of the stream by defendant [an upper riparian proprietor] was adverse and not in the exercise merely of a riparian right. The use was as much adverse and could have been as readily enjoined as if the diversion had been to another watershed for use on nonriparian lands." The use of the waters of a stream by a riparian owner upon nonriparian lands is a nonriparian use. In such a case the riparian owner was held to be a trespasser on the rights of the lower riparian owner from the inception of such use. (*Anaheim Union Water Co.* v. *Fuller,* 150 Cal. 327, 334 [88 P. 978, 11 L.R.A.N.S. 1062].)

 From the foregoing statements of the law we see no escape from the conclusion that the defendant in the storage and use of the waters of Klamath River at its Copco No. 1 plant was not within its rights as a riparian owner; that such use was a nonriparian use and was adverse to the right of riparian owners. (25 Cal.Jur. 1191, sec. 203.)

It has repeatedly been held that the seasonal storage of water is a nonriparian use thereof; that it is not within the rights of the riparian owner and is adverse to the rights of the lower owner on the stream. While there is no contention that the storage of the waters at the Copco dam comes within the definition of that term, the effect of such storage as is made by the defendant at Copco No. 1 plant upon the rights of lower owners on the stream is similar in practically all respects to that sustained through seasonal storage, and differs only in immaterial respects. The storage by defendant, which is sometimes referred to as periodic storage, is often more damaging to the rights of the lower owners than seasonal storage. In seasonal storage, the waters of the stream are stored during times when the water in the stream is abundant and discharged in that part of the year when there is a scarcity of water, and often to the advantage of the lower

owners. The storage by defendant occurs during the dry season of the year when there is a scarcity of water and when lower proprietors are in greatest need for the waters for use upon their lands. To hold that storage which results on occasions when the bed of the river is dry during the daytime and prevents lower riparian owners of any use of the waters during the nighttime and on Sundays and holidays is a proper riparian use of the stream, while seasonal storage is not, seems both illogical and unreasonable, and contrary to long established principles of law governing the respective rights of owners of water upon a stream.

As the use by the defendant of the waters of the river after its completion of its Copco dam was a nonriparian use of said waters, it was adverse to the rights of the lower riparian owners. This use had its inception at the time the Copco plant was completed and the water was used.in the operation by defendant of its power plant located at that point in the year 1922. Such a use of the waters of the stream, when continued for a period of five years openly, continuously and under a claim of right so to do, gave the defendant a right by prescription to the waters of the river to the extent of such use. There is no contention but that the defendant has operated its plant for the required period of time and to the extent and in the manner required by the laws of this state to give it such right.

The law is so well-established in this state as to require no extended citation of authorities that an upper riparian owner may acquire a prescriptive right to the waters of a stream as against a lower riparian owner by an adverse use of said waters for the prescriptive period. (*Pabst* v. *Finmand,* 190 Cal. 124, 128-130 [211 P. 11]; *Miller & Lux* v. *Enterprise C. etc. Co.,* 169 Cal. 415, 422 [147 P. 567]; *Mt. Shasta Power Corp.* v. *McArthur,* 109 Cal.App. 171 [292 P. 549].)

It is equally well-established that prescriptive rights are *stricti juris* and should not be extended beyond the actual user. (*North Fork Water Co.* v. *Edwards,* 121 Cal. 662, 666 [54 P. 69]; *Strong* v. *Baldwin,* 137 Cal. 432, 440 [70 P. 288]; *Scott* v. *Fruit Growers Supply Co.,* 202 Cal. 47, 53 [258 P. 1095].)

In the case of *North Fork Water Co.* v. *Edwards, supra,* the plaintiff had acquired the right to maintain a ditch over and across the lands of the defendant for the purpose of con-

veying water to a large number of families for domestic and other uses. The course of the ditch was along a hillside. Long after the construction of the ditch plaintiff constructed aprons for the purpose of carrying the storm waters over the ditch and onto defendants' lands upon which the defendants had planted fruit trees. Defendants in order to protect their lands from the storm waters diverted upon their lands by means of those aprons, erected dams below the aprons thus throwing the storm waters into plaintiff's ditch. The action was brought to enjoin the defendants from maintaining said dams, the plaintiff claiming it had acquired a right by prescription to maintain said ditch over and on defendants' lands, and that the right so acquired included the right to construct aprons over their ditch to protect against storm waters flowing from the high lands above. The trial court gave judgment for the defendants, and in affirming the judgment this court held (page 665) "The necessity for these aprons is of recent origin, in nowise connected with the origin of the easement. ... The burden of the dominant tenement cannot be enlarged to the manifest injury of the servient estate by any alteration in the mode of enjoying the former. ... Rights by prescription are *stricti juris,* and should not be extended *beyond the user* ... they [the aprons] were in the nature of changes in the mode of enjoyment, and while they might be made if not harmful to the servient estate, they cannot be made to its material injury." (Italics ours.)

The principle announced in that case was applied to the prescriptive right to the use of waters of a stream, in the case of *Scott* v. *Fruit Growers Supply Co., supra,* where it was stated: (page 53) "Prescriptive rights are *stricti juris* and should not be extended beyond the actual user. (*North Fork Water Co.* v. *Edwards,* 121 Cal. 662 [54 P. 69].) Since the prescriptive right is limited by the extent of the use which conferred the title, the place of use cannot be changed, where to do so would interfere with the rights of others."

In the present case the defendant after the completion of its Copco dam in 1922, used the waters of the river to operate its plant in such a manner as not to interfere with plaintiffs' use of the waters of the river during the daytime, with certain exceptions. Having so used the waters of the stream for the statutory period of five years, it acquired the right to such use as against the plaintiffs. However this right to so use the waters of the stream must be "limited by the

extent of the use which conferred the title" and cannot "be extended beyond the actual user" where such change results in injury to others.

In two decisions of the Circuit Court, we find it stated: "Any person may obtain exclusive rights to water flowing in a stream or river by grant or prescription as against either riparian owners on the stream or the prior appropriation of the water by other parties. But the right acquired by prescription is only commensurate with the right enjoyed. The extent of the enjoyment measures the right." (*Union Mill & Mining Co.* v. *Dangberg*, 81 F. 73, 91; *Anderson* v. *Bassman*, 140 F. 10, 26.) Other decisions of this court are in line with those just cited. (*Northern California Power Co.* v. *Flood*, 186 Cal. 301, 306 [199 P. 315]; *Pabst* v. *Finmand*, 190 Cal. 124, 134 [211 P. 11]; *Bazet* v. *Nugget Bar Placers, Inc.*, 211 Cal. 607, 616 [296 P. 616]; see also 25 Cal. Jur. 1178.)

In the case of *Northern California Power Co.* v. *Flood, supra,* page 304, we find this significant language: "The right to the use of waters of a stream may be acquired, as against others entitled thereto, by taking and beneficially using the same adversely and continuously under a claim of right for a period of five years. But in such a case the right, with respect to the quantity of water therein, extends only to the quantity actually put to a beneficial use. . . . In order to gain a right to the water the diverter must actually use it and the *quantity used measures the extent of his right.*" (Italics ours.)

While the defendant after the completion of its Copco dam used all the waters of the river in the operation of its plants, its use of said waters was such that ample water for irrigation purposes ran down to plaintiffs' lands until the year 1931. The quantity of the water used during that period of time may have been the same as that subsequently used, and of course it was, as in all years the defendant used all the waters of the river, but the manner of its use was not the same as before 1931. This change in the manner of use resulted in as great an injury to plaintiffs' rights as if the whole quantity of water had been diverted from the stream, as, under the conditions prevailing in 1931 and thereafter, plaintiffs were unable to use any of the waters of the river for irrigation purposes. As the injury to plaintiffs' rights

to the use of the waters during the daytime did not begin until the year 1931, some two years before this action was begun, plaintiffs' action therefore was not barred by the statute of limitations.

Before concluding this opinion, however, we deem it proper to answer some of the main contentions of the defendant in support of the judgment.

Defendant's first contention that its prescriptive right was perfected in 1927, five years after the completion of its Copco No. 1 plant in 1922, has virtually been answered by what we have already stated. It is true it gained certain prescriptive rights by the use to which it put the waters of the stream for the five year period just prior to 1927. But, as we have seen, these prescriptive rights did not include the right to change the conditions under which it acquired those prescriptive rights. There is substantial evidence in the record that up to that year the plaintiffs and their predecessors in interest received sufficient water from the stream and under conditions which enabled them to irrigate their riparian lands properly. This right as we have shown continued up to the year 1931, some two years prior to the commencement of this action. Defendant has not shown any prescriptive right to use the waters of the river under the conditions which the evidence shows that it has used them beginning with the year 1931.

The next contention is that the use of the waters of a stream is adverse to the rights of a lower riparian owner's rights whether or not he is damaged. A number of authorities are cited in support of this contention. The cases cited are all in actions in which injunctive relief was asked and we are in thorough accord with the rulings contained therein. But our attention has not been called to any authority holding that damages may be awarded a riparian owner of lands for an interference with his riparian rights without proof on his part that he has actually been damaged by reason of such interference.

In the case of *Collier* v. *Merced Irrigation District*, 213 Cal. 554 [2 P.2d 790] a lower riparian owner on the stream asked for an injunction against defendant restraining it from diverting the waters of the stream. The court held that the defendant had devoted the waters continuously to a public use and denied an injunction. Plaintiff then contended that as the defendant had taken his property for a public use, that is, had interfered with his riparian right, he was entitled to

damages in the difference between the market value of his property with and without this property right. In mitigation of damages the defendant stipulated and agreed to provide plaintiff and make available for his land such amount of water as would be reasonably required by plaintiff for irrigation purposes and to make such stipulation a part of the decree of the court in that action. The question of damages was tried by a jury under proper instructions by the court. The jury returned a verdict in favor of the defendant. The judgment based upon the verdict was affirmed. In that case the riparian rights of the plaintiff were decidedly interfered with. In fact they were practically lost to him. Yet this court held that he had sustained no damage as he was receiving all the waters of the river required for the irrigation of his lands. In the present action the plaintiffs, or at least their predecessors in interest, could have maintained an action for damages, if brought within the required period of time after the completion of the Copco dam in 1917, sustained by them for the loss of the use of the waters of the river during nighttime and on Sundays and holidays, if the waters were needed for irrigation purposes on their riparian lands. They could not in such action have recovered damages for loss of any further injury as they were then receiving all the water during the daytime required for the irrigation of their riparian lands. It was not until the year 1931 when the defendant so operated its plant as to interfere with plaintiffs' use of the waters of the river during the daytime that plaintiffs were damaged by reason of this loss of the service of the water during the daytime. As we have before stated our attention has not been called to any case or other authority wherein it was held that a lower owner of the stream in an action for *damages only* was entitled to recover for any act of an upper user of the stream in the absence of proof that he had actually been injured by such acts of the upper user.

The next contention of the defendant is included in its discussion of the ''Extent of Defendant's Prescriptive Right.'' Defendant takes the position that, having gained a prescriptive right to use the waters of the river for the operation of its Copco plant, this right extends to the entire flow of the stream and is not limited by any rights of lower owners. In other words, it contends that having gained the right to use and regulate the stream in the operation of its

plant for a period of five years or more, during which time it permitted sufficient water to run down the stream to irrigate the lands of the plaintiffs properly, it may, after the lapse of said period of limitations, so change the extent and manner of its use of said waters as to deprive the plaintiffs of all waters used by it previous to said change. In our opinion the position of defendant is untenable. Previous to the year 1931 the defendant's use of the waters of the river did not interfere with the plaintiffs' use of the stream for the purpose of irrigating their lands during the daytime. As we have shown, rights by prescription are strictly construed against the claimant and should not be extended beyond the actual user, and they are limited by the use which conferred the title. A person claiming title by prescription gains no title to the property claimed beyond his actual use of the property. The extent of the enjoyment measures the right. (See authorities previously cited above.) In the present case as shown above the defendant so used the waters of the river up to the year 1931 as not to interefere with the plaintiffs' use thereof for the irrigation of their lands during the daytime. Therefore its prescriptive right to the waters of the stream was limited by that of the plaintiffs as herein set forth. There is nothing in the case of *Crum* v. *Mt. Shasta Power Corp.*, 220 Cal. 295, 310 [30 P.2d 30], contrary to this conclusion. In that case it was held that a public utility could not place any limitation upon its use of the waters of a stream, which had been theretofore devoted to a public use without the consent and approval of the Railroad Commission. The defendant in the instant action never acquired the right to the entire use of the stream until the year 1931. Before that year its rights in the stream were subject to plaintiffs' right to the use of the stream for daytime irrigation. No limitation was ever placed on defendant's original right by holding it subject to plaintiffs' right, for the reason that defendant's use of the stream was from its inception subject to certain rights of the plaintiffs until their loss in 1931. While plaintiffs could not restrain that use, their action for damages for the loss of their rights would not be barred until the expiration of at least five years thereafter. Nor do we find anything inconsistent with our conclusion in the case of *Seneca Cons. Gold Mines Co.* v. *Great Western Power Co.*, 209 Cal. 206 [287 P. 93, 70 A.L.R. 210], heretofore cited. In

that case it was held reading from one of the head notes [7] "The diversion of the whole stream during the time of the influx of tributaries below the dam of the defendant and above plaintiff's land, in such a case, would not injure plaintiff where its quota of water was not disturbed. . . ."

Defendant makes the further contention that there is no evidence of any change in its facilities or method of operation in 1931 and subsequent years and that any damage to plaintiffs' property was due not to any act of defendant, but to the water shortage especially in the year 1931. It may be true that there is no direct evidence showing that there was any change in defendant's facilities used in the operation of its plant in 1931 and subsequent years, from those employed in previous years. There must have been however, some radical change in its method of operation beginning with the year 1931, as there is substantial evidence to support the implied finding of the jury that, prior to that year, the irrigation rights of plaintiffs and their predecessors in interest, except during the nighttime and on Sundays and holidays, were to no material extent interfered with by the operation of defendant's plant, but that, beginning with the year 1931, and continuing during subsequent years, plaintiffs were unable to obtain practically any water from the river to irrigate their lands. We think the evidence shows that this result during the year 1931 was largely due to the extremely light rainfall during that year and the corresponding shortage of water in the river. Yet there is evidence that during the year 1931 as well as in subsequent years there were substantial fluctuations in the water as it reached plaintiffs' property which materially contributed to plaintiffs' inability to secure the necessary amount of water for use upon their lands. These questions were all given consideration in a previous part of this opinion and we think need not be further discussed.

Finally, defendant contends that the taking of the water right belonging to the lands of plaintiffs occurred prior to plaintiffs' acquisition of said lands. This contention is based upon the assumption that the taking of the waters of the river by the defendant, a public utility, was when the Copco dam was completed in 1922, some years prior to the acquisition of any interest in said lands by the plaintiffs. This contention to some extent we think has been sufficiently

answered by what has been said in the previous parts of this opinion. The damages for which plaintiffs instituted this action to recover were based upon the taking in 1931 of the daytime riparian right to the waters of the stream. The evidence shows that while plaintiff, C. F. Moore, entered into possession of said lands under a contract to purchase the same some years prior to 1931, the deed given in pursuance to the terms of the contract was delivered to him on June 10, 1931. This was practically at the beginning of the irrigating season of that year. Defendant does not seriously contend that plaintiffs had not acquired the property in 1931, nor that they were not the owners thereof in subsequent years. Plaintiffs were therefore the owners of the lands at the time of the "taking of the water right" which occurred during their ownership.

The judgment is reversed with direction to the trial court to enter judgment for the plaintiffs upon the verdict of the jury.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J. pro tem., concurred.

Respondent's petition for a rehearing was denied September 23, 1943. Carter, J., did not participate therein.